In re INVESTMENT COMPANY OF THE SOUTHWEST, INC., Debtor.

F.H. Partners, L.P., Appellant,

v.

Investment Company of the Southwest, Inc., Four Hills Associates, and Bank of America Mortgage, Appellees.

BAP No. NM–04–085.
Bankruptcy No. 11–02–17878–SA.

United States Bankruptcy Appellate Panel for the Tenth Circuit.

April 28, 2006.

Steven A. Klenda, Tisdale and Associates, LLC, Denver, Colorado (Douglas M. Tisdale with him on the briefs), for Appellant.

Daniel J. Behles, Albuquerque, New Mexico, for Appellee Investment Company Of The Southwest, Inc.

Before CLARK, BROWN, and KARLIN [1], Bankruptcy Judges.

## OPINION

KARLIN, Bankruptcy Judge.

This is an appeal by Compass Bank ("Compass" or "Bank") [2] from the order confirming the Chapter 11 plan of Debtor, Investment Company of the Southwest, Inc. ("ICS") (the "Confirmation Order"). Debtor is a real estate developer owning both developed and undeveloped properties primarily in New Mexico. Compass was Debtor's primary lender, and it contends that the bankruptcy court erred in confirming Debtor's modified Second Amended Plan. For the reasons articulated below, the Court reverses and remands this case for proceedings consistent with this Opinion.

## I. JURISDICTION.

With the consent of the parties, this Court has jurisdiction to hear timely-filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit. [3] The appeal was timely filed, and is from an order of confirmation, which is a final order. [4] The parties have consented to this Court's jurisdiction in that they have not opted to have the appeal heard by the United States District Court for the District of New Mexico. [5] Therefore, this Court has jurisdiction.

## II. FACTS.

ICS is a New Mexico corporation with its principal office in Bernalillo, New Mexico. Bob Tinley is president of Debtor. Compass Bank is Debtor's largest creditor. In 2001, Bank commenced an action in New Mexico state court against Debtor and its principals, seeking a money judgment and foreclosure of its mortgages against several of Debtor's properties. A judgment was entered in August 2002, finding Debtor to be in default on its debt to Bank in excess of $2.1 million, plus post-judgment interest and attorney fees, and

---

1. Honorable Janice Miller Karlin, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Kansas, sitting by designation.

2. While this appeal was pending, Compass sold all of its right, title, and interest in the obligations of Debtor to F.H. Partners, L.P. F.H. Partners, L.P. filed a Motion to Substitute itself for Compass, and Debtor did not object to that motion. Accordingly, the Motion to Substitute is hereby granted, and the Court orders that F.H. Partners, L.P. be shown as the appellant in the case caption of this decision. For convenience only, the appellant shall be referred to in this Opinion as "Compass" or "Bank."

3. 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002.

4. *Interwest Bus. Equip., Inc. v. United States Trustee (In re Interwest Bus. Equip., Inc.)*, 23 F.3d 311 (10th Cir.1994).

5. 28 U.S.C. § 158(c); Fed. R. Bankr.P. 8001; 10th Cir. BAP L.R. 8001–1.

ordering the sale of numerous properties. Bank also registered its judgment in two New Mexico counties, thus creating a judgment lien on a substantial portion of Debtor's real property in which Bank had not previously held an interest.

To stop the foreclosure sale, Debtor filed its voluntary petition under Chapter 11 on November 7, 2002. Debtor's Fourth Amended Disclosure Statement, approved on December 4, 2003 (hereafter "Disclosure Statement"), claims that Debtor had "scheduled assets with a value totaling in excess of $11,200,000." [6] These values were admittedly based "upon Debtor being able to retain possession of all its real property assets, finish the development, and sell the parcels at retail." [7] Debtor's most valuable asset was a development named Woodland Hills.[8]

Debtor's liquidation analysis, Exhibit F to the Disclosure Statement, showed a net liquidation value of real estate, after deduction of sale costs of 10%, of $4,384,411, based upon the assumption that all properties would be liquidated through brokered sales in a six to twelve month period. The principal balance owed to all creditors, including the U.S. Trustee and Debtor's attorney, is listed in Exhibit D to

the Disclosure Statement as $5,260,654. The liquidation analysis does not include the value of personal property assets, and there appears to have been no testimony or documentary evidence provided to establish the value of such property at confirmation.

The Bank's proof of claim totals $2,842,676. Debtor filed an objection to that claim, as well as to the claim of Four Hills, approximately seven months postconfirmation. The bankruptcy court did not conduct a hearing to estimate the amount of those claims before confirmation. Instead, the Confirmation Order provides that until the amount of its allowed claim is determined, payments to Compass under the modified Second Amended Plan was to be based upon a Principal Balance of $2,250,791. This Plan also provides for the payment to Bank of "Old Interest," which the bankruptcy court found to be $91,173.[9] Bank also claims a right to attorney fees of $170,000 for the state court litigation, plus additional attorney fees for the bankruptcy litigation in an amount never estimated in the record.[10]

The original Disclosure Statement was filed in conjunction with Debtor's Second

---

**6.** Disclosure Statement at 15, *in* Joint Appendix ("App.") Vol. I at 144.

**7.** *Id.*

**8.** Debtor has owned Woodland Hills for fifteen years. Improvements on some lots were completed in 1998, but only one lot had been sold before the Compass foreclosure litigation was filed in 2001. Fifteen lots were sold prior to confirmation, and at the time of confirmation approximately 119 lots remained unsold; Debtor's principal testified that it would take six or seven years to complete their sale. Only preliminary development had been completed on Debtor's second most valuable asset, Four Hills, at the time of confirmation.

**9.** "Old Interest" is the term used by the parties and the bankruptcy court to describe the amount of interest that accrued on the state court judgment between the date the judgment was entered until the date the Chapter 11 petition was filed, and which remained unpaid as of confirmation. *See* Memorandum Opinion at 37 and Confirmation Order, *in* App. Vol. I at 90 and 47. All parties seem to admit that the Plan calls for "Old Interest" to be paid without interest over the seven-year Plan period.

**10.** This Court assumes that the attorney fees incurred during the pendency of this 2002 bankruptcy case, which has come on appeal to this Court twice in three years, and which engendered 282 docket entries in the lower court, are likely considerable for both parties.

Amended Chapter 11 Plan,[11] and it summarized the plan treatment for all creditors as a "partial liquidation, partial work out Plan," with the workout portion of the plan requiring liquidation of some of Debtor's assets in the ordinary course of business through the sale of inventory. Debtor also planned to develop raw land not yet ready for resale. Finally, Debtor intended to retain its improved properties, with the rents to be used to service the debt on those properties. The plan provided for the payment of administrative claims in full, the payment of secured claims over periods as long as 20 years (including some balloon payments), the payment of unsecured claims in full over 60 months, and the vesting of property in Debtor free and clear of all liens, except as otherwise provided in the plan.

Creditors Compass Bank and Four Hills, the second largest secured creditor, as well as four other creditors, objected to confirmation. Debtor and Four Hills settled their differences prior to the confirmation hearing, which resulted in Four Hills receiving a reduced amortization period from 20 to 10 years, a balloon payment in the seventh year, and an increased interest rate to 7.25% in years three through five of the plan, and 8% thereafter. The court orally denied confirmation of the plan that included that settlement with Four Hills, but stated that a modified plan containing certain outlined changes would be confirmable if so filed.

These modifications required significant changes to the plan's treatment of Compass, including payment in full over seven years, rather than the 16 years originally provided, and a cram down interest rate of 7%, instead of 6.25%. The modifications made to the plan, including the settlement with Four Hills, resulted in Debtor's obligation to pay Compass and Four Hills in excess of $2,404,179 more over the seven year life of the plan than had been required by the earlier plan. Bank asserts that although Debtor objected to its claim, it has admitted Bank's claim is at least $2,420,791, which will require total payments over seven years of $3,176,762. Debtor does not dispute these calculations.[12]

Debtor adopted those court-proposed changes when it filed its Modification to and Restatement of Second Amended Chapter 11 Plan on April 23, 2004. Compass again objected, and on June 1, 2004, Debtor filed a Modification of Plan to Address Compass Bank Objections. A short second confirmation hearing was held (because the prior testimony was incorporated into this hearing), and the court confirmed a Plan consisting of the Modified and Restated Second Amended Chapter 11 Plan, the Modification to Chapter 11 Plan to Address Compass Bank Objections, and additional modifications orally required by the court, which were then added to the confirmation order. This series of documents, read together, constitute the Confirmed Plan (hereafter referred to as the "Confirmed Plan" or "Plan").

Debtor never amended the two-year projections attached as an exhibit to its Third Amended Disclosure Statement, filed in September 2003, to reflect the substantial plan amendments orally required by the bankruptcy court, even though those amendments significantly increased the quarterly and annual payments required to be made to Compass

---

**11.** The Second Amended Chapter 11 Plan was filed on September 29, 2003, in conjunction with the Debtor's Third Amended Disclosure Statement.

**12.** These calculations are, for the most part, contained in Tab 10, Addendum 24 and Tab 12, Addendum 97 to Appellant's Brief ("App. Br.").

and Four Hills,[13] and required very substantial balloon payments in the seventh year. Debtor, and the court, thus relied on significantly outdated projections in, respectively, advocating and approving the Plan.

The Confirmed Plan generally proposes to liquidate assets upon which Bank held mortgages (before the foreclosure action) and judgment liens and to use those proceeds to pay Bank, to pay operating expenses, and to pay all other creditors. As each parcel of real property secured to Bank is sold, Debtor is required to pay Bank a "release price." The bankruptcy court originally established release prices for each tract, when the parties could not agree on those prices, in May and June 2003,[14] and in most instances, Debtor used a substantially similar number in its final Plan. For nearly every tract of real property, the release price is substantially less than the anticipated net proceeds from the sale.

The aggregate of the release prices for properties that the Confirmed Plan unequivocally commits Debtor to sell totals a little over $2 million. The aggregate of the release prices for all properties for which prices were determined by the Court (even those the Plan only intends to sell "if necessary") is $3,146,424. That amount is thus slightly less than the minimum total payments required to be made to Compass of $3,176,726, which payments are based on Debtor prevailing in its objection to the claim filed by Compass.

The Confirmed Plan also requires that on each anniversary of the effective date, if the Bank has not received payments (from release prices) sufficient to reduce its original principal balance by 1/7 or more, Debtor shall make an additional principal payment. In addition to this annual reduction of principal, the Plan requires quarterly payment of accrued interest on the principal balance. Compass Bank retains its lien only until each tract of real property is sold and the release price is received. Thus, the Plan eliminates the "cross-collateralization" rights originally afforded to the Bank in its financing instruments. The Confirmed Plan also provides that if Debtor defaults on any post-confirmation obligation due to Bank, Bank

---

13. For purposes of this appeal, Compass created a chart demonstrating that those changes resulted in Plan payments in the first year, alone, of $220,634 higher than Debtor had projected in its two-year projections, $247,227 higher in year 2, $264,606 higher in year 3, $270,997 higher in year 4, $274,328 higher in year 5, $278,685 higher in year 6, and $847,703 higher in year 7 (because of the substantial balloon payment due that year), for a total of $2,404,179 higher payments over the first seven years of the Confirmed Plan. See App. Br. at Tab 12, Addendum 97.

14. According to this Court's prior order entered in the first appeal in this case, in In re Inv. Co. of the Sw., 302 B.R. 112 (Table), 2003 WL 22900480, at *1 (10th Cir. BAP 2003), the release price was essentially the remaining principal balance that would have been owed on the promissory note (had the note and mortgage not been foreclosed). The release

price of each parcel where Compass's lien position was inferior to the lien position of any other creditor was "the lesser of a) 10% of the net sales price of the parcel ... or b) 50% of the net proceeds owing to debtor, calculated after subtracting all costs of sale, closing costs, payment of any superior liens, and the payment of any tax liens held by creditors in Classes 14 and 15." Id., at *2. On December 8, 2003, this Court vacated the bankruptcy court's "release price" order, holding that it not only approved the sale of estate property free and clear of Compass's undisputed lien interests therein without first satisfying 11 U.S.C. § 363(f), but that it also established Debtor's treatment of Compass's claim without affording Compass the protections of the Chapter 11 confirmation process, which required that the plan be fair and equitable under 11 U.S.C. § 1129(b)(1)-(2)(A). Id., at *6–7.

is entitled to enforce its existing foreclosure judgment by noticing an immediate sale, subject only to a ten-day right to cure.

The Confirmed Plan's means of execution divides Debtor's assets into four categories. The first category consists of 12 real properties, the "Real Estate Assets Liquidated," that Debtor will list with a real estate broker for sale. The second category of properties is "Real Estate Assets Leased"; which includes improved properties that are or will be leased, with the rental income providing cash flow to fund the Confirmed Plan as well as Debtor's operations. The third category includes "Real Estate Assets Sold or Developed," which consists of large tracts of undeveloped land that Debtor intends to hold for long-term development, subdivision and sale.

The fourth category contains "Personal Property Assets," the most substantial of which include interests in various partnerships that Debtor intends to sell or develop to service the debt owed to creditors secured by these assets. Compass does not have a lien on these personal property assets, and thus if Debtor defaulted, Compass would have to share any recovery from this category with all creditors. As with the second and third categories of assets, the Plan specifically reserves the right to sell the Personal Property Assets if necessary to fund the Confirmed Plan.

## III. MOTION TO DISMISS APPEAL AS EQUITABLY MOOT.

After this appeal was fully briefed, Debtor moved to dismiss under the doctrine of equitable mootness. We have an obligation to determine the jurisdictional issue of whether the appeal is moot, including whether it is moot in the constitutional sense, i.e., that there is no remaining case or controversy.[15]

As this Court has previously noted in *In re Milk Palace Dairy*,[16] there are two ways in which bankruptcy appeals may become moot.

First, the Constitution authorizes federal courts to hear only "cases" or "controversies." There is no case or controversy if some event has occurred post-appeal that makes it "impossible for the court to grant 'any effectual relief whatever,'" and the appeal is moot. This is the concept of constitutional mootness. Second, if we can fashion effective relief for [appellant] and this appeal passes the constitutional mootness test, we must still determine if ordering such relief would be equitable because this appeal arises in the context of a confirmed Chapter 11 case involving multiple parties. This is the concept of "equitable" mootness. Equitable mootness deals with parties' reliance upon a substantially consummated plan of reorganization and the point at which modification of that plan would unduly impact innocent third parties.[17]

Thus, the key distinction is between cases that are moot when "no effectual relief whatever" can be fashioned, and cases where "even though effectual relief could conceivably be fashioned, implementation of that relief would be inequitable."[18]

---

15. See U.S. Const., art. III, § 2 and *In re Long Shot Drilling, Inc.*, 224 B.R. 473, 477 (10th Cir. BAP 1998).

16. *In re Milk Palace Dairy, LLC*, 327 B.R. 462 (10th Cir. BAP 2005).

17. *Id.* at 466–67 (footnotes omitted).

18. Ross E. Elgart, *Bankruptcy Appeals and Equitable Mootness*, 19 Cardozo L.Rev. 2311 (1998).

There are no Tenth Circuit decisions applying the doctrine under the Bankruptcy Code. In an appeal from confirmation of a Chapter 11 plan, *In re King Resources Co.*,[19] the Court of Appeals for the Tenth Circuit denied a motion to dismiss on mootness grounds. Because the confirmation order was not stayed pending appeal, third parties had subsequently made good-faith purchases of stock in the reorganized company and could not be compelled by the court to return their stock. The Court of Appeals refused to dismiss the appeal as equitably moot. It reasoned that the appeal involved more than just consummated sales, and held that it could not say that a decision that the plan was erroneously confirmed could not have some effect on the proceedings below, even if it could not undo all that had taken place.

The most-cited equitable mootness case, and the one relied upon by Debtor, is *In re Continental Airlines*.[20] In that case, the Court of Appeals for the Third Circuit identified five factors that should be considered when determining whether it would be equitable to reach the merits in a bankruptcy appeal:

(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and

(5) the public policy of affording finality to bankruptcy judgments.[21]

These factors are given varying weight depending on the particular circumstances of each case.

When a reorganization involves intricate transactions, substantial consummation, as defined in 11 U.S.C. § 1101(2),[22] is a foremost consideration.[23] Reliance by third parties, particularly investors, on the finality of a transaction is high on the list of prudential considerations taken into account by courts.[24] Under the circumstances presented in *Continental Airlines*, the Third Circuit determined that no prudential considerations would support the creation of even a limited remedy for the appellants, as it would necessarily impose a new debt on a reorganized debtor, which at the time of the appeal was a different entity than it was when the case was before the district court. The *Continental Airlines* decision has been characterized as "the most expansive application of the equitable mootness doctrine to date."[25]

This Court has previously thoroughly considered and applied the factors set forth in *Continental Airlines*, in *In re Long Shot Drilling*,[26] and more recently in *In re Milk Palace Dairy*.[27] In *Long Shot Drilling*, an appeal was filed from a confirmation order. While the appeal was pending and only one month after entry of the confirmation order, the debtor moved for a

---

19. 651 F.2d 1326, 1331–32 (10th Cir.1980)

20. 91 F.3d 553 (3rd Cir.1996).

21. *Id.* at 560.

22. This case was filed before October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, became effective. All statutory references are therefore to 11 U.S.C. §§ 101–1330 (2004), unless otherwise specified.

23. *In re Continental Airlines*, 91 F.3d at 560–61.

24. *Id.* at 562.

25. Elgart, *Bankruptcy Appeals*, 19 Cardozo L.Rev. at 2312.

26. *In re Long Shot Drilling, Inc.*, 224 B.R. at 479.

27. 327 B.R. at 467.

significant plan modification whereby 100% of the equity interest of the debtor's president and CEO would be purchased by TriPower Drilling. TriPower would then immediately assume operation of the reorganized debtor's business. The modification was approved over the appellant's objections, and a timely second appeal was taken. Appellant did not seek or obtain a stay, and the sale to TriPower was consummated.

The two appeals were consolidated, and the debtor then moved to dismiss the appeals on equitable mootness grounds. This Court agreed that the appeals should be dismissed, applying the five factors from *In re Continental Airlines*. Although the first factor, "substantial consummation," was satisfied, substantial consummation by itself was held insufficient to moot an appeal from an order of confirmation. Likewise, as to the second factor, this Court held that failure to obtain a stay pending appeal cannot be determinative on the issue of equitable mootness, because it is the absence of a stay that generally has caused the change of circumstances. This factor would thus be present in all appeals not stayed, so this Court held that a stay is not necessary to preserve all appeals.

The third issue, whether the relief requested would affect the rights of parties not before the court, required this Court to examine each of the issues presented for appeal to determine the effect of reversal on the rights of third parties, as well as to determine whether practical relief was available. In *Long Shot Drilling*, this factor was the most critical. This Court held that a reversal on plan feasibility would adversely affect TriPower (which had invested over $300,000 and undertaken management of the extant company), unsecured and secured creditors (who had been paid with those funds), and the principal of

the debtor whose interest had been sold to TriPower. None of those parties were before the court. Likewise, this Court held that a determination as to whether the modification order violated the absolute priority rule would also affect third parties not before the court.

The fourth factor, whether the relief requested on appeal would affect the success of the plan, also weighed heavily against reaching the merits because the cash infusion made after confirmation had been used to pay prepetition creditors, fund the payment of administrative claims, and support the operations of the reorganized debtor. As to the fifth factor, this Court reasoned that third-party TriPower had relied upon the finality of the confirmation order, which had never been stayed.

During the pendency of this appeal, this Court also applied the *Continental Airlines* factors in *Milk Palace Dairy*.[28] In that case, the debtor was liable to Metropolitan for a mortgage on certain real property that an entity related to the debtor actually owned. The bankruptcy court allowed the debtor to purchase the property, and Metropolitan appealed, seeking a reversal of that order. Metropolitan, however, did not seek a stay. During the pendency of the appeal, the debtor sold a portion of the property at a public auction under § 363, a creditor's plan of reorganization was confirmed, and the remaining portion of the purchased property was transferred to a liquidating trust that was not a party to the appeal. The appellees then moved to dismiss the appeal as moot. After considering the factors identified in *Continental Airlines, Long Shot Drilling*, and other cases, this Court easily, and with little discussion, held that all five requisite

28. *Id.*

factors were present and dismissed the appeal as moot.

ICS argues that all five *Continental Airlines* factors are satisfied here. It argues that the first factor, which it urges is the most important, is present because the Confirmed Plan has been substantially consummated. As established by an unrebutted affidavit filed with Debtor's motion to dismiss, all property (other than cash) to be transferred by the Confirmed Plan, consisting primarily of promissory notes given to each class of secured creditors, has been distributed. At the time the motion to dismiss was filed in June 2005, Debtor had also made distributions to creditors in the amount of approximately $310,000.[29]

Debtor argues that the second factor is also present, since no stay was requested or obtained. Debtor also argues that the third factor is present because third parties not before the Court who have received payments would be required to return them, and there is no evidence they could do so. Debtor notes that Compass seeks reversal of the entire Confirmation Order and assumes that were that relief to be granted, it would vacate the release price feature of the Plan, causing Compass to be entitled to all proceeds from the sale of collateral already sold. Debtor asserts that reversal would therefore affect two groups of non-parties, creditors who have already received cash, and purchasers to whom properties were conveyed free of Compass's liens. Similarly, as to the fourth factor, Debtor argues that the Plan would be doomed without its ability to retain a portion of the proceeds from the sale of properties subject to Compass's

liens. Finally, Debtor argues the general public policy favoring finality of court orders.

In response, Compass Bank first argues that Debtor's equitable mootness motion should be denied because Debtor waived the issue by not sooner filing the motion to dismiss. Compass argues that Debtor allowed additional time to expire before raising the issue. The Court rejects that contention; the motion was brought in a timely fashion.

As to the merits, Compass Bank argues that equitable mootness should not apply to ICS's straightforward Confirmed Plan (in other words, not an intricate plan with complex transactions), because this Court can grant effective relief that will not unjustly affect third parties. Compass argues that the most important factor is the effect of relief on third parties.

Under the facts of this case, however, Debtor, the party asserting mootness, has not met its heavy burden of establishing that there is no effective relief remaining for this Court to provide.[30] Compass's arguments are persuasive given the terms of ICS's Confirmed Plan and the minimal lapse of time since confirmation. Although three of the *Continental Airlines* factors, the first, second, and fifth, are present here, they are not sufficient to warrant dismissal of the appeal.

The first factor, substantial consummation, is present, which fact the Bank does not seriously challenge. However, the acts of consummation in this case, in contrast to both *Long Shot Drilling* and *In re Milk Palace Dairy*, are comparatively minimal. The distributions made under the Plan are

---

**29.** No affidavit addressing any change in circumstances between the filing of the motion to dismiss on mootness grounds, and the time of oral argument, a period of approximately 5 months, was provided to this Court.

**30.** *In re Focus Media, Inc.*, 378 F.3d 916, 922–23 (9th Cir.2004), *cert. denied*, 544 U.S. 968, 125 S.Ct. 1742, 161 L.Ed.2d 616 (2005).

of the revised promissory notes to Debtor's various creditors. These notes merely adjust pre-confirmation rights between Debtor and its creditors. There has been no distribution of stock. There has been no infusion of capital. There has been no sale of assets, other than in the ordinary course of business. Only limited payments have been made to creditors. Since the only parties involved are those who participated in the bankruptcy proceeding (as opposed to bona fide purchasers or other third parties), the public policy of finality for bankruptcy court orders does not weigh heavily here.

Nor would reversal of the Confirmation Order and remand to the bankruptcy court adversely impact the rights of third parties. First, when questioned at oral argument whether those who have received payment post-confirmation had the ability to repay those payments, Compass indicated that it would not seek the return of payments from third parties. Second, there is no need to disturb distributions, sales, payments, and other similar transaction made pursuant to the Plan prior to remand. The five *Continental Airlines* factors are thus not satisfied; pragmatic relief that does not adversely affect the rights of third parties is possible. For the foregoing reasons, Debtor's motion to dismiss the appeal as equitably moot is denied.

## IV. OBJECTIONS TO CONFIRMATION.

Compass contends that the Confirmed Plan is too indefinite, that there is insufficient evidence in the record before this Court to affirm the finding of feasibility, that the Plan is not fair and equitable as required for cram down by 11 U.S.C. § 1129(b)(2)(A), and that the cram down interest rate of 7% set by the court violates the standard set forth by the Supreme Court in *Till v. SCS Credit Corp.*[31]

### A. ISSUE I—LACK OF FEASIBILITY AND INDEFINITENESS.

#### 1. SCOPE OF REVIEW AND LEGAL STANDARD.

■ Whether a plan is feasible is a question of fact, subject to the clearly erroneous standard on appeal from an order confirming the plan.[32] Findings of fact will not be reversed on appeal unless found to be clearly erroneous.[33] "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all the evidence, [the reviewing court is] left with the definite and firm conviction that a mistake has been made."[34] In reviewing findings of fact, we are compelled to give due regard to the opportunity of the bankruptcy court to judge the credibility of each witness.[35]

■ Debtor bears the burden to show feasibility by a preponderance of the evidence.[36] Feasibility is the shorthand term for the requirement of confirmation as set forth in § 1129(a)(11); it imposes a requirement that any plan must provide a realistic and workable framework for reorganization. A plan is considered feasible where it is not likely to be followed by the

---

31. 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004).

32. *In re Pine Mountain, Ltd.*, 80 B.R. 171–72 (9th Cir. BAP 1987).

33. Fed. R. Bankr.P. 8013.

34. *In re Miniscribe Corp.*, 309 F.3d 1234, 1240 (10th Cir.2002) (citing *In re Peterson Distrib., Inc.*, 82 F.3d 956, 959 (10th Cir. 1996)).

35. Fed. R. Bankr.P. 8013.

36. *In re Danny Thomas Props. II Ltd. P'ship*, 241 F.3d 959, 963 (8th Cir.2001).

liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

 The leading Tenth Circuit case addressing feasibility is *In re Pikes Peak Water Company.*[37] It describes the purpose of the feasibility requirement as preventing the "confirmation of visionary schemes which promises [sic] creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."[38] When determining whether a plan is feasible, a bankruptcy court must carefully scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable.[39] "Feasibility determinations must be 'firmly rooted in predictions based on objective fact.'"[40]

 When determining whether a plan is feasible, courts often consider a debtor's cash flow projections showing its ability to simultaneously make plan payments and fund projected operations.[41] The projections must be based upon evidence of financial progress and must not be speculative, conjectural, or unrealistic.[42] While courts often do not require projections for the same period over which a long-term plan spans, a debtor must still sustain its burden to somehow prove that

it will be able to perform all obligations it is assuming under the plan.[43] This is especially true when significant balloon payments are required in years not covered by the projections.

 A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the plan is not feasible.[44] On the other hand, when a court finds that the financial projections presented to support the plan are derived from "realistic and reasonable assumptions which are capable of being met[, t]he fact that unexpected events may defeat those projections does not make a plan unfeasible as a matter of law or fact."[45]

## 2. BANKRUPTCY COURT'S FINDINGS.

The Confirmation Order held that confirmation of the revised Plan was not likely to be followed by liquidation or further financial reorganization, except as was provided in the Plan. The court found that although Debtor's post-filing operating reports disclosed only "break-even cash flow" and "relatively few sales of property," "testimony" [presumably of Mr. Tinsley, the Debtor's president] coupled with "appraisals (for example, exhibit E to the Third Amended Disclosure Statement),"[46]

---

37. *In re Pikes Peak Water Co.,* 779 F.2d 1456 (10th Cir.1985).

38. *Id.* at 1460 (quoting *In re Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1382 (9th Cir.1985)).

39. *In re Pikes Peak* at 1460.

40. *In re Danny Thomas Props.,* 241 F.3d at 964 (quoting *In re Clarkson,* 767 F.2d 417, 420 (8th Cir.1985)).

41. *In re Trevarrow Lanes, Inc.,* 183 B.R. 475, 482 (Bankr.E.D.Mich.1995).

42. *Id.*

43. *Id.* at 483 n. 7.

44. *Id.* at 482.

45. *In re Ridgewood Apartments of DeKalb County, Ltd.,* 183 B.R. 784, 789 (Bankr. S.D.Ohio 1995).

46. Memorandum Opinion at 12, *in* App. Vol. I at 65. The "appraisals" referred to are line item amounts contained in the asset sales projected for the first two post-confirmation years.

supported the conclusion that the estate could effectuate the sales needed to make the required Plan payments.[47] The court had also previously found it more likely than not that Debtor would be able to liquidate enough real and, if needed, personal property, and to lease other properties, to pay all the obligations as they came due under the Plan.[48]

### 3. ARGUMENTS OF THE PARTIES.

Compass first contends the Confirmed Plan is too indefinite to confirm because Debtor retains complete discretion over which assets to sell, when to sell them, and whether to purchase assets for itself or its principals by paying the established release prices, which prices were set at significantly less than market value. One example of this latter concern is that Debtor owns the house in which its president resides (which is valued at $250,000), and can force Compass to release its first lien against the house by merely paying the release price of $168,000. It argues that the bankruptcy court appears to have confirmed the Plan simply because ICS has many tracts of real estate and other personal property to sell, and because Compass would 1) remain "adequately," "amply," or "fully"[49] secured while ICS tried to sell the assets, and 2) would be able to foreclose quickly if ICS could not sell sufficient assets to meet the payments.

Bank relies upon In re Walker[50] for the proposition that the Confirmed Plan's failure to provide a schedule for liquidating the assets renders the Plan speculative, unfeasible, not proposed in good faith, and

not in the best interests of creditors. The Walkers, like Debtor, were in the land development business. Their plan provided for them to use their "best efforts" to liquidate "as quickly as possible" two properties to fund payments to the appealing unsecured creditor, with the timing for making payments left open ended, and granted the debtors unfettered discretion as to the details of plan implementation. The Walker plan did not contemplate liquidation of the debtors' substantial personal property and allowed debtors to alienate or encumber their personal assets.

The district court reversed, finding a violation of the good faith requirement because the plan subjected creditors to unacceptable risk, did not adequately commit all of the debtors' assets to the plan, vested uncontrollable and unreviewable discretion in the debtors, and made relief under Chapter 11 a vehicle for debtors' continued pursuit of a very enjoyable lifestyle at the expense of its largest unsecured creditor. The court also found the feasibility standard not satisfied because of the absence of detail regarding the terms and timing of the proposed partial liquidation.

In response to Compass's argument that the Plan is too indefinite, Debtor responds by distinguishing this case from Walker, arguing that the Confirmed Plan provides a specific payment schedule for Compass and all other creditors. The Plan generically provides for the liquidation of properties with an established value sufficient to meet the repayment schedule. Debtor further argues that its Plan need not disclose day-to-day operations and sales to be confirmed. Debtor also argues that Com-

---

47. Id.

48. Oral Ruling on Approval of Second Amended Chapter 11 Plan at ¶ 11, in App. Vol. I at 99.

49. The bankruptcy court variously uses each of these words to describe Compass's oversecured status in its oral and written opinions.

50. Crestar Bank v. Walker (In re Walker), 165 B.R. 994 (E.D.Va.1994).

pass's right to immediately foreclose upon default ensures feasibility, when that option is coupled with the Bank's significantly oversecured status.

The Bank next argues that, at least on the record before this Court, it is impossible to reasonably conclude that Debtor can make all the required Plan payments. Compass suggests the court overlooked Debtor's actual track record of sales and its two-year sales/income/expense projections, which clearly show an inability to financially sustain the Confirmed Plan, in favor of the Debtor's president's generalized testimony of "we can do it." Compass is correct that the Plan does not require specific properties to be sold over any specific period of time. Instead, it merely provides the formula for determining the required payments.

The only projections in the record cover the first two post-confirmation years. The payments required under the Plan, in contrast, span seven years to the two largest creditors, Compass and Four Hills, and as long as 20 years to other secured creditors. Furthermore, and more troubling to this Court, the projections the bankruptcy court relied on to confirm the Plan were inaccurate, because they contained payment amounts based on an earlier plan that called for a significantly longer repayment period and lower interest rates.

Debtor made significant amendments to the last version of the plan for the purpose of complying with the court's April 2004, oral ruling, which denied confirmation of the Second Amended Plan but outlined what changes *would* make the plan confirmable. This resulted in Debtor being required to make annual payments in an amount substantially higher than had been contained in its two-year projections. For example, when one compares the payments required under the plan for which the projections were originally made to those required by the Confirmed Plan, the total increase in payments to Compass and Four Hills in year one is $220,634. The increase in year two is $247,227.[51] Over the first seven years of the Plan, which is the period over which Compass is to be paid, the payments required to Compass, alone, are $1,240,662 higher than provided for in the Second Amended Plan that was rejected by the bankruptcy court, and $2.4 million higher to all creditors.

Finally, Compass correctly claims that Debtor's ability to make balloon payments was never addressed in the projections relied on by the bankruptcy court when it determined feasibility, because, again, the projections covered only the first two post-confirmation years. Accordingly, Compass argues there was no evidence before the bankruptcy court that Debtor had the ability to fund two balloon payments to other creditors in year five (totaling over $500,000) and a $732,830 balloon payment

---

**51.** To support its argument of lack of feasibility and failure to provide it the "indubitable equivalent" of its claim, Compass Bank has included in its brief substantial computations, none of which Debtor challenges. *See, e.g.,* App. Br. at Tab 10, Addendum 24 and Tab 12, Addendum 97. This Court realizes that Compass did not provide these summary charts to the bankruptcy court, making its job of extrapolating all of these numbers much more difficult than it has been for this Court. This Court can and has relied on these calculations, which do not constitute "new evidence," as Debtor essentially admits when it argues that its own failures to provide similar payment information in its Plan, or at confirmation, are not fatal because the bankruptcy court had the same ability to make these calculations (amounts, amortization periods, and interest rates) when it considered feasibility. These calculations are critical to this Court's analysis, and this Court acknowledges that the bankruptcy court's inability to review them likely caused or contributed to its erroneous findings of fact.

to Four Hills in year seven.[52]

Debtor responds by pointing to the testimony of its President, Mr. Tinley, who testified that he believed his company could fund the Plan, even though it required payment over a much shorter period, and at a higher interest rate than originally proposed. Debtor also suggests its post-petition performance, whereby Debtor sold a few Woodland Hills lots and made substantial adequate protection payments to Compass from proceeds of property sales, coupled with the stable release price formula provided in the Plan, supports feasibility.

Compass also argues that there is no evidence in the record to support Mr. Tinley's conclusion that Debtor will be able to liquidate sufficient property at the time intervals implicitly required to fund the Plan. The Bank calculates that the required Plan payments total a minimum of $7,324,300 over the first nine years, and perhaps as much as $8,110.332 if Compass and Four Hills prevail in the claims objection process.[53] Although the two year projections upon which Mr. Tinley's testimony was based identified certain sales anticipated to fund the first two years' Plan payments, at the end of two years, those projections are cash flow negative, as were Debtor's own average quarterly operating reports during the bankruptcy.[54] The fact the cash flow projections are negative is even more significant when one realizes that the cash flow analysis is based on significantly lower payments than the Confirmed Plan actually requires.

Debtor responds that there is no requirement that the court look only to projections to determine feasibility, because projections are admittedly unreliable. Debtor contends that the court correctly looked to other factors, including Debtor's ability to liquidate personal property to make payments to Compass,[55] and to the credibility of Mr. Tinley, who testified Debtor could make the required payments. Unfortunately, Debtor did not cite to the record, either in its papers or upon specific questioning during oral argument, where the purported value or liquidity of the personal property is evaluated, and this Court has been unable to locate any valuation of that personal property in the record (other than in Debtor's opening schedules).[56] More importantly, because Com-

---

52. The balloon payment would actually be $838,462 if Four Hills prevails on the pending objection to its claim. *Compare* App. Br. at Tab 10, Addendum 24 "Admitted Claims" with Tab 11, Addendum 79 for "Asserted Claims."

53. *Id.*, comparing Addendum 24 and Addendum 79.

54. *See* Summary of Cash Receipts and Disbursements, as reported in Monthly Operating Reports for 2003, *in* App. Vol. II at 61. Mr. Tinley also testified that Debtor's average pre-confirmation quarterly performance showed a negative cash flow of $24,638. February 19, 2004, Confirmation Hearing Transcript ("Tr.") at 219–221, *in* App. Vol. I at 327–328. This was at a time when Debtor was not making anywhere near the level of payments that would be required even in year one of the

Plan, let alone years 5 and 7, when the balloon payments would become due.

55. Debtor relies on the Oral Ruling on Approval of Second Amended Chapter 11 Plan at ¶ 11, *in* App. Vol. I at 99, where the bankruptcy court did indicate that Debtor's personal property served as an additional guarantee of payment.

56. *Id.*, *in* App. Vol. I at 98–99. The bankruptcy court's opinions cite to sections within Debtor's last plan as the location for personal property values, but a review of both the Third and Fourth Amended Plans reflects no valuation, but instead, merely a listing of some of those assets. An independent review of the testimony of Mr. Tinsley shows that Debtor did not provide a liquidation value for personal property, and Mr. Tinsley in fact testified that Debtor had not identified which

pass has no lien on that personal property collateral, Compass cannot look to it to satisfy its claim in the event of default.

Debtor also relies on the testimony of Mr. Tinley that sales made pre-confirmation during the Chapter 11 were consummated at or above the prices in Debtor's schedules and that sales prices would likely adjust upwards due to appreciation of the real estate over the life of the Plan. Compass counters with the argument that the sales were at a level that would be insufficient to make the Plan payments now required, and that the sales upon which Debtor relies cannot be replicated because they were "plum assets." No evidence of the marketability of many of the assets to be sold over the life of the Plan is cited, and no estimation of claimed appreciation rates is provided.

Compass also argues that the record shows that the Confirmed Plan's total required payments exceed the net proceeds to be received from the two categories of property that the Plan expressly intends to sell. Debtor responds that this analysis is irrelevant, indicating that if it is unable to make the required payments selling the categories of property outlined, the Plan allows Debtor to sell other properties, the total value of which it claims to be $12 million (if sold at retail). Compass responds that even if all assets are included, their value is insufficient to ensure payments, because Debtor's valuation projections do not account for ongoing operational costs of $3.34 million and sales costs of 10 percent, which result in less than the required $11.44 million required to satisfy the Asserted Claims.

creditors had secured interests in the personal property assets, making it impossible for the Court to determine if there was any net equity available. Tr. at 97–99, *in* App. Vol. I at 269.

### 4. ANALYSIS.

As a preliminary matter, this Court does not agree that the Plan is too indefinite to confirm merely because it did not precisely set out the dollar amount required at each payment interval or itemize which properties would be sold in which order.[57] A debtor like ICS, which is in the business of selling real estate held as inventory, is not required, in its plan, to predict with precision which of its dozens of lots will sell first, or require specific deadlines for the sale of specific assets, for fear advertisement of such known deadlines would impair the marketability of the lots. Further, it is unlikely that realtors can accurately predict over a seven year period when a buyer for a particular tract will surface. That said, there must be some evidence that Debtor's overall plan to sell part or all of its inventory is reasonable, based on either past performance or identifiable factors indicating the likelihood of probable future performance, or both. What is important is that the trier of fact have evidence on which to base its finding that it is more likely than not that Debtor will be able to make all payments required by the Confirmed Plan.

Although this Court agrees that the Plan is not too indefinite to confirm, the bankruptcy court's finding, under § 1129(a)(11), that confirmation of this Plan is not likely to be followed by the liquidation of the Debtor, must be reversed as clearly erroneous. The main evidence relied on by Debtor to establish that it could actually sell various parcels of real estate in the amounts, and over the

57. Because we have determined that the Plan is not too indefinite, we likewise reject Compass's argument, which is based on the "too indefinite" premise, that the Plan is thus not proposed in good faith or is not in the best interests of creditors.

time frame, necessary to fund the Plan was its two-year projections, coupled with its prior performance and the testimony of its principal that it would be able to complete the Plan. Debtor also argues that there is sufficient equity in its real estate holdings to adequately assure that Compass's claim will be paid in full, with interest. This Court does not agree that the evidence in the appellate record supports the finding of feasibility.

First, Compass complains that the court erred in not requiring Debtor to provide projections over longer than two years, especially when significant balloon payments must be funded in later Plan years. Debtor argues that it needed only to provide projections for the first two years post-confirmation, because those are the most financially difficult years. That statement does not ring true in light of the significant balloon payments required. Although a court need not require projections in excess of two years for plans that are longer than two years, the court does need some evidence, whether it be formal projections, or otherwise, to explain how those balloon payments are to be reasonably funded.

In addition, and more importantly, the two-year projections were themselves flawed for several reasons. First, they were premised on lower payments to the two major creditors, Compass and Four Hills, than the Plan actually requires. The Plan requires payments to all creditors in amounts exceeding $937,000 in year one, and $926,000 in year two. The projections only showed payments (on mortgages only, and nothing to unsecured creditors or priority or administrative claims) in the first year of $828,000, and in the second year of $591,000. Debtor did not cite to the record where it had demonstrated in its own projections that it had the ability to handle this $444,000 shortfall.

Second, even assuming lower payments to creditors than the Plan requires, the projections showed negative cash flow after the first year, including a negative cash flow in seven of the eight post-confirmation quarters projected. Third, these projections did not take into account all the sales commissions and closing costs that the Disclosure Statement and its principal's testimony predicts.[58] Finally, Debtor's own operating reports showed it had not sold properties during the pre-confirmation period at the pace that would be necessary to fund this Plan. In the last ten months of operating reports contained in the appellate record, Debtor had a negative net cash flow in seven of those ten months.

The bankruptcy court appears to have determined that the Plan was feasible by looking at the end of the Plan term, and opining that, over time, there would be enough real estate (or personal property) sold to satisfy everyone. The problem is that this Plan, itself, requires more. The Plan requires that creditors be paid according to the amortization schedule contained therein, which provides for payments exceeding $1.8 million in its first two years. Debtor's own projections show no ability to pay that amount, and in fact, show a shortfall over $400,000. Again, feasibility determinations must be firmly rooted in predictions based on objective fact; this Court located nothing in the record, and Debtor provided no citation to the record, indicating how Debtor proposed to acquire that additional $400,000.

Instead, the record reflects that Debtor had a weak sales history for the same kinds of properties that it proposes to sell to fund the Confirmed Plan. Debtor's prin-

---

**58.** Mr. Tinley testified that sales costs and fees were in the 10–12% range.

cipal admitted that he had no plans for the infusion of additional capital by investors or through new loans. He also admitted that a change in management was unlikely. The bankruptcy court appears to have confirmed the Plan based almost exclusively upon the testimony of Mr. Tinley, and upon a belief that Debtor has sufficient assets, after further development and land appreciation, to pay all of its claims. It was clearly erroneous to have relied on Debtor's principal's optimistic testimony, which was expressly contradicted by Debtor's own post-filing performance and the very cash flow projections supplied by Debtor to the court in support of the Plan, unless there was a clear explanation in the record as to why Debtor's projections should have been discounted. No such explanation was ever provided. Because feasibility determinations must be firmly rooted in predictions based upon objective fact, there is insufficient evidence in the appellate record to support the bankruptcy court's finding of feasibility.

 Debtor next argues that even if the Plan is not otherwise feasible, its "drop-dead" provision in the event of default allowing Compass to quickly resume its state court foreclosure action renders the Plan feasible. Both Debtor and Compass rely on *In re Danny Thomas Properties II Limited Partnership*,[59] to support their respective positions on this issue. That case holds that the mere right to foreclose upon default does not render a plan feasible as a matter of law. Rather, a court must look at whether the property that the creditor would be entitled to foreclose and sell would be sufficient to pay the remaining claims.[60] In this case, resolution of this factual question is related to the release price issue, which is discussed

below. As that discussion shows, there are too many unknown factors for a court to conclude that in the event of a default Compass would in all circumstances be made whole through foreclosure of assets in which it holds a lien, or otherwise. The drop-dead clause, therefore, does not ensure feasibility.

In addition, the mere existence of a drop-dead clause does not prove feasibility. It only provides a method for a creditor to extricate itself more quickly, and force a quicker liquidation, if it turns out that the court guessed wrong in finding the plan feasible. In other words, inclusion of the drop-dead clause may result in a creditor not losing as much—because it can more quickly liquidate the remaining collateral upon default—but it does not, on the front end, support a finding that a plan, itself, is not likely to be followed by the liquidation of, or the need for further financial reorganization by, the debtor.

## B. ISSUE 2—FAIR AND EQUITABLE—INDUBITABLE EQUIVALENT.

### 1. SCOPE OF REVIEW AND LEGAL STANDARD.

 Whether a plan provides a secured creditor with the indubitable equivalent of its claim is a mixed question of law and fact.[61] "Although the underlying facts for such a determination are reviewed under the clearly erroneous standard, 'the ultimate conclusion of indubitable equivalence is a question of law which we review de novo because it requires analysis of the meaning of the statutory language in the context of the Bankruptcy Code's 'cram

---

59. 241 F.3d at 963.

60. *Id.* at 964–65.

61. *In re Arnold & Baker Farms,* 85 F.3d 1415, 1421 (9th Cir.1996).

down' scheme." '[62] *De novo* review requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision.[63]

Section 1129(a)(8) requires, with respect to each class of claims or interests, that such class has accepted the plan, or that such class is not impaired under the plan. If, with respect to a class of secured claims, a plan meets all of the requirements for confirmation except those of subsection eight, it may nevertheless be confirmed under § 1129(b)(1) if the plan does not unfairly discriminate and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

With respect to secured claims, "fair and equitable" is defined by § 1129(b)(2)(A) to include three alternative treatments. It provides:

(A) With respect to a class of secured claims, the plan provides—

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value

of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

This statute thus defines three conditions under which a plan may be confirmed, or "crammed down," over the objections of a secured creditor.

Subsection (b)(2)(A)(i) of § 1129 in essence allows the plan proponent to write a new loan for full payment at a market rate of interest secured by the creditor's pre-petition collateral. Subsection (b)(2)(A)(ii) permits a plan that sells the creditor's collateral free and clear of the lien, so long as the lien attaches to all net proceeds of the sale. Finally, § 1129(b)(2)(A)(iii) allows a plan to alter the rights of the secured creditor if, and only if, the creditor will receive the "indubitable equivalent" of its claim.[64]

In this case, the first two conditions of § 1129(b)(2)(A) do not apply. The Plan modifies Compass's rights with respect to collateral because it provides for the sale of its collateral without its lien attaching to *all* the proceeds of each sale.[65] This Plan,

---

**62.** *In re Sunflower Racing, Inc.*, 226 B.R. 673, 687 (D.Kan.1998) (quoting *In re Arnold & Baker Farms*, 85 F.3d at 1421).

**63.** *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

**64.** *See 7 Collier on Bankruptcy,* ¶ 1129.02[5][a] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2006).

**65.** Again, the Plan provides that as each lot or tract is sold, Compass must accept the "release price," which is considerably less than the full value of the collateral in almost every instance.

therefore, satisfies the statutory requirement for cram down only if it provides Compass with the indubitable equivalent of its claim as required by § 1129(b)(2)(A)(iii).

The phrase "indubitable equivalent" is derived from Judge Learned Hand's decision in *In re Murel Holding Corp.*[66] In that case, confirmation was denied where the plan would have extended the time of payment to a first mortgage holder and would also have given lien priority to a lender of new money. The court stated:

> In construing so vague a grant [that the judge have power to "equitably and fairly" provide "adequate protection"], we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.[67]

The key to indubitable equivalence is that the substituted treatment of the creditor be indubitably equivalent to the creditor's secured claim.[68]

▬ Evidence of the requisite indubitable equivalent is present if, under the treatment proposed in the Plan, there is no reasonable doubt that Compass will receive the full value of what it bargained for when it made its contract with Debtor.[69] When a plan proposes to substitute or alter collateral, however, a secured creditor receives the indubitable equivalent of its claim only if the substituted collateral does not increase the creditor's exposure to risk.[70] Where collateral is to be substituted, two attributes of the substituted collateral—its *value* and the degree of *risk* that it imposes on the secured creditor— determine whether the new collateral is sufficiently "safe" and "completely compensatory."

▬ New collateral with a value less than the value of the originally-pledged collateral cannot be "completely compensatory." Similarly, new collateral with a value projected to be equal to, or even more than, the original collateral is not "completely compensatory," if the new collateral is so much riskier than the original collateral that there is a substantially greater likelihood that the secured creditor will not ultimately be paid.

*In re Pikes Peak Water Company*[71] has been acknowledged to be the leading Tenth Circuit case concerning the indubitable equivalent standard. The plan in *Pikes Peak Water,* however, provided that the secured creditor would retain its lien and receive deferred cash payments totaling the allowed amount of its claim, thereby satisfying § 1129(b)(2)(A)(i)(I); thus, the court's discussion of indubitable equivalent is dicta. Nevertheless, the opinion is

**66.** *In re Murel Holding Corp.,* 75 F.2d 941, 942 (2d Cir.1935).

**67.** *Id.*

**68.** *In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346, 1350 (5th Cir.1989).

**69.** *In re Freymiller Trucking, Inc.,* 190 B.R. 913, 915–16 (Bankr.W.D.Okla.1996).

**70.** *In re Arnold & Baker Farms,* 85 F.3d at 1422.

**71.** 779 F.2d 1456 (10th Cir.1985).

instructive; the Court of Appeals acknowledged that § 1129(b)(2)(A)(iii) requires that secured creditors receive the indubitable equivalent of their claims, relying on Judge Learned Hand's opinion in *In re Murel Holding Corp. Pikes Peak Water* held that the "indubitable equivalent" standard of § 1129(b)(2)(A)(iii) was satisfied where the creditor received full payment over time and the value of the collateral property was over $600,000 greater than the creditor's claim.[72]

Compass argues that due to the inclusion of mandatory release prices, the Plan alters its rights in the collateral that it required Debtor pledge to it when it made the loans, as well as in the additional liens in other collateral that Compass received when it docketed its judgment in several other counties. Compass argues that the Plan requirement that it release its lien each time a tract of real estate is sold, in exchange for release prices that are more often than not much less than the net value of the tracts, does not constitute the indubitable equivalent of its original bargain. By way of example, Compass points to a trial exhibit showing two Corona del Sol tracts, where it will be required to release its first lien on two tracts valued at $95,000 each for only $25,000 each, or only 26% of value, the Vail NE condominium where it must accept 28% of the value in exchange for giving a full release, and the Hillcrest Park condominium where it must accept 25% of the value. The average percentage of the proposed sale prices for all tracts upon which Compass apparently has a first lien is only 51%.

Debtor responds that without the use of release prices, no real estate developer holding lots for sale could ever reorganize, because none of the lot price could be retained to make plan payments and fund ongoing operating costs. Debtor further responds that because Compass is so oversecured, there is essentially no reasonable way that Compass would not be paid, regardless of the fact that release prices are set considerably below net sales proceeds, and for that matter, below the full amount of the Plan payments that must be made to Compass.

This Court has considered two cases that apply the indubitable equivalence standard when the plans contained a release price feature. The most helpful is *In re TMA Associates, Limited*.[73] In *TMA*, the debtor's sole asset was a single commercial property valued at between $1.8 and $2 million, with a square foot value between $3 and $3.35. The only secured creditor was a bank, which held a deed of trust on the property as security for its $1 million debt. The plan provided that the bank would be paid from future property sales and would partially release its deed of trust upon payment of $1.95 per square foot that it would receive when the property was sold. A junior creditor was then to receive payment from the excess sale proceeds after the bank received its $1.95 per square foot "release price."

The bankruptcy court confirmed the plan relying upon *Pike's Peak*, and the district court affirmed, finding no persuasive evidence that partial releases would impose a material or significant risk upon the bank. It rejected the bank's argument that it was not receiving the indubitable equivalent of its secured claim because certain partially junior and partially senior insider secured creditors would be paid in full prior to the bank. The court reasoned that if the bank received $1.95 per square foot from each sale, there was no risk that

---

72. *Id.* at 1460–61.

73. *In re TMA Associates, Ltd.,* 160 B.R. 172 (D.Colo.1993).

the bank's claim would not ultimately be paid in full. The ratio of the release price to the per square foot value ($1.95/($3.00 to $3.35)) was higher than the ratio of the amount of the claim to the value of property ($1.M/($1.8M to 2M)). Thus, the amount of the unpaid claim was reduced more quickly than the value of the remaining collateral.

The second instructive case involving release prices is *In re Wester*.[74] In that case the debtors were individuals, not real estate developers. The objecting creditor was a bank holding a claim secured by a first mortgage on the debtors' home and 51 contiguous acres. The plan provided that the bank's claim would be reamortized over 30 years at 11% interest and that the debtors would sell off portions of the 51 acres with the sale proceeds going to the bank in exchange for releases. The court rejected the plan, finding that the debtors had failed to demonstrate that the piecemeal carving off of the property subject to the lien would not result in a diminution in value of the remaining property such that the bank would lose the protection of whatever equity cushion was presently available. Accordingly, the court held that the plan did not provide the bank the indubitable equivalent of its claim.

## 2. BANKRUPTCY COURT'S FINDINGS.

The bankruptcy court here found that ICS's Plan satisfied the *Pikes Peak Water* definition of indubitable equivalence. It found that ICS' Plan allowed Bank to retain its liens on all collateral until each tract was sold at or above the specified release prices, or until Bank was paid in

full. The court further found that "the values of the unsold property on which the Bank retains its liens will easily be sufficient to fully collateralize those liens."[75] It expressly rejected Compass's argument that the release prices were set at a value whereby the Bank's claim could be left undersecured before its claim was paid in full at the end of year seven. It reasoned that the value of the real estate securing the Bank's lien exceeded $6 million (if one assumes Debtor will be able to develop the land as proposed), and that the total of the release prices associated with those properties equaled approximately $3.1 million, which the court found to be approximately 25% more than the amount of the Bank's "allowed claim."

The court further held that "[w]hat is important is that the aggregate sum offer adequate security, even if only a portion of the property (and perhaps only the most valuable property) has been sold when and if a default occurs."[76] The court found the risk of nonpayment to be "essentially nonexistent,"[77] and further found the existence of the drop-dead provision a significant feature in its determination of indubitable equivalence.[78]

## 3. POSITIONS OF THE PARTIES.

ICS convinced the bankruptcy court that the use of release values is necessary for its rehabilitation. It intends to sell its inventory of real estate, using the equity to repay all its creditors, and argues that because of the total value of its assets, Compass will remain adequately secured until its claim is paid. Compass does not oppose the use of release values as a mat-

---

74. 84 B.R. 770 (Bankr.N.D.Fla.1988).

75. Memorandum Opinion at 6 and 12–13, *in* App. Vol. I at 59 and 65–66.

76. *Id.* at 13, *in* App. Vol. I at 66.

77. *Id.* at 11 and 28, *in* App. Vol. I at 64 and 81 (holding Compass is "amply secured").

78. *Id.* at 15–16, *in* App. Vol. I at 68–69.

ter of law, and in fact consensually re-leased its liens on certain properties during and before the bankruptcy filing. Rather, Compass argues that the Plan is not fair and equitable to it because the release prices are set too low, such that the application of the release price mechanism increases its risk by both changing the collateral mix that secures its claim and by changing its position of priority with respect to that collateral.

Compass argues that before Plan confirmation, it had one "bundle of assets" upon which it had a first lien, and a second group upon which it had an inferior lien by way of its docketed judgment. It asserts that this combination of assets included a diverse mix of developed lots, income-producing properties, and land held for development and sale. Compass claims that such a mix is important to it, because the risk of default can then be spread out over the various types of property. Compass then argues that as ICS sells Compass's more easily salable collateral (Woodland Hills and ICS' Leased Properties) and uses those proceeds to pay other creditors under the Plan, the remaining property left to secure Compass's claim could become increasingly less valuable. For example, Debtor could sell already developed lots in established developments, leaving raw land that is less-liquid (because it could require infusion of capital to plat and provide water and road access to it) and

land upon which Compass only has a junior, instead of a senior, lien interest.

Compass argues that while the most easily salable collateral is supposedly worth $1.32 million, Compass will receive only $650,000 in release prices from its sale. Meanwhile, Compass argues, the creditors who are secured by ICS' undeveloped, less-liquid (and therefore less valuable) assets will actually be paid from the remaining $682,000 from the sale of the "better" land, rather than from their own less-valuable collateral. Compass also argues that ICS can use the proceeds from its collateral to pay wholly unsecured creditors, who under the Plan are entitled to receive $50,964 each year for the first five years of the Plan—before Compass receives the last $790,000 of its Plan payments.

Compass then presents on appeal a detailed hypothetical example showing that if Debtor sells assets in a certain order, the Confirmed Plan can theoretically take Compass from its position as a generously secured first lienholder to a junior lienholder.[79] In the example, if Debtor defaulted after year four, Compass could only recover its remaining $518,000 claim from assets in which it has a junior position, and only by paying off the senior lien holder's claim to avoid being foreclosed from the property. Further, instead of being secured by a "bundle" of diverse assets, Compass could find itself secured by raw land that is essentially incapable

79. A quick summary of the example is as follows: Debtor sells 22 of the Woodland Hills lots, which are Debtor's most readily salable/valuable properties, and also sells all other assets on which Compass has a first lien during the first two years, using release prices to pay its $1.03 million Plan payments to Compass (leaving a balance of $1.73 million due Compass). If Debtor then sells 63 Woodland Hills lots in years 3 and 4, Compass will still have a claim of $1.028 million after re-ceipt of release prices. This claim would then be secured with the remaining 34 Woodland Hills lots (which would only have a net value of $841,500 after sales costs), and ICS would only have to pay $510,000 in release costs when it subsequently sold out Woodland Hills, leaving Compass with a remaining claim of "nearly $500,000" to be paid, and no remaining assets on which Compass would then hold a senior lien. App. Br. at 35–36.

of being developed [80] without infusion of additional capital. Because there is no provision in the Plan for the infusion of additional capital, the Plan would then theoretically fail.

Compass also argues that the Confirmed Plan does not provide it with the indubitable equivalent of its claim because it must release it liens upon receipt of the unfairly low release prices, the aggregate value of which ($3,146,424) [81] is less than the required aggregate payments of at least $3,176,762 due Compass under the Plan.[82] Compass suggests that it is not receiving the indubitable equivalent because the Plan, as a result of the release price provision, exposes it to increased risk. It contends that Debtor's ability to force it to release its liens at such low prices increases the likelihood of default in the later years of the Plan, because all the readily salable assets would have been sold, because there is no plan for infusion of capital necessary to develop and then sell the less developed land, and because of the large balloon payment due two other creditors in year five and to Four Hills in year seven. Compass argues it thus has an increased risk when compared to a quick liquidation of all assets in a Chapter 7, not only because of the increased risk of default, but also because its ability to collect after a default would be diminished due to the loss of the collateral mix and its now inferior priority position on the remaining collateral.

In response, Debtor argues that the release prices are merely intended to compensate Compass for the diminution of its collateral value, and were never intended to be the sole source of payment to Compass. Debtor points to the Plan's requirement to pay quarterly interest to Compass as well as to annually pay 1/7 of Compass's remaining principal balance, if release prices were insufficient in any given year to pay that amount. Debtor also uses a practical argument to suggest that it does not have the ability to stagger the sale of assets in the way Compass fears, and thus the bankruptcy court was correct in finding that Compass would at all times remain adequately secured. Debtor further notes that as proceeds from the sale of assets upon which Compass has a first lien are used to pay down other creditors holding first priority liens on some of the property in which Compass has a second priority lien, Compass's secured position on those properties will improve.

When pressed, at oral argument, for citations to the record to support the bankruptcy court's finding that under no set of events could Compass have any risk of not ultimately being paid, Debtor was unable to cite to such evidence other than to its principal's conclusory testimony that the Plan was feasible and to the summary of monthly operating reports (which show negative cash flow). Debtor's brief cites only to the Confirmation Order, and of course, the bankruptcy court did not have the benefit of considering the example that

---

**80.** The Disclosure Statement at 4 and 10, *in* App. Vol. I at 133 and 139, states that some raw land has "no developable access," no "satisfactory survey," and is "not presently developable."

**81.** *See* Assessment of Release Prices Proposed by ICS's Modified Second Amended Plan, App. Br. at Tab 9, Addendum 23, and App. Vol. II at 5. This hypothetical assumes Debtor has chosen, or been forced, to sell (to avoid

default) all properties for which release prices were assigned, including assets that the Plan specifically indicates that it intends to hold for production of rental income and for long term development.

**82.** App. Br. at Tab 10, Addendum 24. Compass's risk of not getting paid obviously increases if it and/or Four Hills prevail(s) in the claims objection litigation.

Compass has now so neatly laid out in its appellate papers in deciding that Compass had "no risk."

### 4. ANALYSIS.

 The indubitable equivalent standard requires both the absence of any reasonable doubt that the secured creditor will receive the payments to which it is entitled, and that the changes forced upon the objecting creditor are "completely compensatory," meaning the objecting creditor is fully compensated for the rights it is giving up. Because the final payment is not due Bank until the end of year seven, we must focus on the adequacy of Bank's collateral for the entire duration of Compass's repayment period. When a plan changes a secured creditor's collateral, a court must examine both the value of the substitute collateral and the risk imposed on the creditor by the substitution. Although the release price feature of the Plan is not precisely a collateral substitution provision, the analysis is the same because the effect is to require Compass to release its liens for usually much less than the value of the property.

The undisputed evidence is that the aggregate of all release values is less than the amount of the total payments due Compass under the Plan.[83] In reaching the conclusion that the Plan nevertheless provided Compass indubitable equivalence, the bankruptcy court chose to instead compare the release prices only to the principal amount due Compass. The bankruptcy court also reasoned that even if the receipt of release prices did not satisfy Compass's debt, Compass could always look to personal property collateral upon which it does not have a lien to satisfy its debt. This result is insufficient to provide Compass the indubitable equivalent of its prior interest.

First, Compass has demonstrated that a scenario reasonably exists where the real property collateral would not fully secure its debt. Second, trading its first lien on the most easily salable assets for a junior lien on less easily marketable assets, or a totally unsecured interest in personal property never valued by the Court, is not the indubitable equivalent of its claim. Third, even if the personal property assets are highly valued, the right to receive payment upon liquidation, from personal property assets that would have to be shared with all other creditors (assuming none has a security or other superior claim to that collateral) does not provide Compass the indubitable equivalent of its claim. Finally, nothing in the Plan prevents Debtor from immediately liquidating any of the personal property, such that it would not be available for payment of creditor claims in later years of the Plan.

The bankruptcy court was required to compare the total of the release prices that Compass would be forced to accept to the total of payments due Compass in order to determine whether any reasonable doubt exists as to whether the Plan provided Compass with the indubitable equivalent of its pre-confirmation position. When that comparison is made, there exists reasonable doubt whether Compass will remain adequately secured throughout the term of the Plan, a position apparently everyone

---

**83.** Debtor does not now contest the numbers Compass has included in its appellate brief. The arguments by Compass presume, for this appeal, that Debtor will prevail on its claims objection. If Compass and Four Hills prevail, the Plan's failure to provide indubitable equivalence is even more pronounced. In addition, the fact that Compass is oversecured, at least at the time of confirmation, a fact Debtor admits, which entitles Compass to attorney fees on top of its claim, also serves to increase Compass's risk that it may not ultimately be paid in full.

agrees Compass enjoyed before the bankruptcy was filed. The hypothetical example provided by Compass, which details a method by which Debtor could sell its assets, thus rendering Compass secured on significantly less valuable and less liquid assets, and on which it would be merely the junior lienholder, precludes a finding that this Plan provides Compass the indubitable equivalent.

Furthermore, even if the amount of the release values exactly equaled the full payout required to Compass, the indubitable equivalent standard would likely not be satisfied because such a plan would have eliminated any equity cushion that Compass enjoyed pre-petition. Such a plan would also have allowed Compass's risk of default and non-payment to increase because of the significant change in the collateral mix, and the unfettered discretion given to Debtor to choose which assets to sell in what order.

Debtor again argues that the "dropdead" provision in the Plan serves to provide Compass the "indubitable equivalent," because it allows Compass to quickly proceed to a foreclosure sale upon default. The bankruptcy court specifically found that this provision assured that Compass would be paid in full. It reasoned that if default occurred, by definition that would mean that at least a portion of the property securing Compass's debt would not have yet been sold and could be the subject of foreclosure, in which case the entire lien on any remaining real estate, not just the release value, would be available to Compass.

A quick default provision, however, does not cure the lack of indubitable equivalence that results from the reduction of collateral value and quality through the release price mechanism. The standard requires that the *Plan* provide the secured

creditor with the indubitable equivalent of its unaltered claim, and it does not.

The bankruptcy court, during the confirmation hearing, stated its rationale for approving a Plan with release prices. It indicated that the concept of release prices is to allow a debtor to sell off assets, using the available equity in the collateral to fund payment to all creditors, while being sure that the secured creditors remain adequately protected. It recognized that the values should be set consistent with "full protection" of the creditor.

This Court agrees, in principle, that a debtor may be able to tap at least some portion of the equity that has built up in collateral to fund a plan by establishing values by which a secured creditor's lien may be released—without violating the indubitable equivalent requirement. Otherwise, no real estate developer, by definition, could likely ever reorganize. That said, if release prices are going to be used, their application cannot result in any reasonable possibility that a creditor will not be fully protected at all times until its claim is satisfied.

The bankruptcy court found the value of the collateral upon which Compass had liens "easily ... sufficient to fully collateralize those liens" and the risk of nonpayment nonexistent, while focusing on how the Plan *should* work (payment to Compass from sources in addition to the sale properties with a release price) rather than how the Plan *could* work to Compass's detriment. The difference in outcome is this Court's strict application of the indubitable equivalent standard.

Furthermore, the treatment provided Compass is materially different from that provided to the creditor in *In re TMA Associates, Limited,* upon which Debtor

relies.[84] There the court found that the creditor would, in due course, be paid in full through the periodic receipt of a release price of $1.95 per square foot. It is significant that the collateral at issue in *TMA* was a single asset, and the uncertainties regarding plan performance, which are present in this case, were not present in that case. There, the release price was approximately 60% of the total per square foot value of $3.00 to $3.35, whereas the creditor's secured claim was approximately 52% percent of the value of the collateral. In other words, the *TMA* creditor continued to be oversecured after receipt of each release price, and the percentage of the debt paid decreased more quickly than the value of the remaining collateral.

Because under this Confirmed Plan, Debtor is not in any fashion restricted as to when or which properties it will sell, and because Debtor has not provided projections of Plan performance from which one can without a reasonable doubt conclude that Compass will in fact remain oversecured until it is paid in full (and before more valuable collateral is substantially liquidated or diminished in value), this Court must reverse the finding that the Confirmed Plan meets the requirement of 11 U.S.C. § 1129(b)(2)(A)(iii) that Compass be provided the indubitable equivalent of its claim.

### C. ISSUE 3—CRAM DOWN RATE.

### 1. SCOPE OF REVIEW AND LEGAL STANDARD.

The bankruptcy court held that the cram down rate in this Chapter 11 proceeding would be determined using the formula approach recently adopted by the Supreme Court in *Till v. SCS Credit Corp.*[85] *Till* held that for purposes of Chapter 13 plans, courts should begin by looking at the national prime rate of interest charged to creditworthy commercial borrowers and then adjust that rate to reflect the typically greater risk of nonpayment by debtors who have filed bankruptcy. Neither of the parties to this appeal challenge the applicability of the *Till* formula to a Chapter 11 proceeding, but Compass does allege that the bankruptcy court erred in fixing the rate at 7%.

Compass argues that the expert witnesses who testified regarding the appropriate interest rate testified before the *Till* decision was issued (although the bankruptcy court's decision was issued afterwards) and thus the hypothetical questions put to the experts were flawed, because they did not fairly take into account the *Till* analysis. Because this Court has reversed the confirmation of the Plan on other grounds, and because there is no disagreement as to the legal standard, this Court declines to address the cram down rate.[86] If Debtor promulgates an amended plan, the bankruptcy court can then determine the correct interest rate given the market at that time, given the unique facts of the new plan, and given the current status of property sales.

### V. CONCLUSION.

For the reasons stated, this Court reverses the Confirmation Order on the basis that feasibility is not supported by the evidence cited by Debtor in the appellate record and because the Plan does not provide Compass Bank with the indubitable equivalent of its claim. This Court denies

---

**84.** 160 B.R. 172.

**85.** 541 U.S. at 479–80, 124 S.Ct. 1951.

**86.** Likewise, this Court declines to rule on any additional arguments made by Compass in support of reversal because a revised plan to cure the deficiencies noted herein may well render its other arguments moot.

Compass's request that it remand with instructions to convert this case to a Chapter 7 proceeding, and instead remands the case for further proceedings consistent with this Opinion.