**In re RIDGEWOOD APARTMENTS OF DeKALB COUNTY, LTD., Debtor.**

**Bankruptcy No. 2–92–08638.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

April 17, 1995.

Stephen C. Greenberg, Holt, New, Zatcoff & Wasserman, Atlanta, GA, for Federal Nat. Mortg. Ass'n.

Richard G. Hardy, Ulmer & Bern, Cleveland, OH, for debtor.

Carol G. Stebbins, c/o Cardinal Realty Services, Inc., Reynoldsburg, OH, for Cardinal Realty Services, Inc.

### OPINION AND ORDER ON OBJECTION TO CONFIRMATION AND MOTION FOR RELIEF FROM STAY

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court on the request of Ridgewood Apartments of DeKalb County, Ltd. ("Debtor") and its general partner, Cardinal Realty Services, Inc. ("Cardinal") for confirmation of a jointly proposed First Amended Chapter 11 Plan ("Plan").

Federal National Mortgage Association ("Fannie Mae") has objected to confirmation and has rejected the Plan. Therefore, the Debtor seeks confirmation under the "cram down" provisions of 11 U.S.C. § 1129(b). Fannie Mae also filed a motion for relief from stay, the resolution of which depends upon the confirmation decision.

The Court has jurisdiction in this contested matter under 28 U.S.C. § 1334 and the General Order of Reference previously entered in this district. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) which this bankruptcy judge may hear and determine.

Fannie Mae maintains that the Debtor's plan improperly classifies claims and contrives to impair a class to satisfy the "one impaired class must accept" rule of § 1129(a)(10). Fannie Mae also challenges the Debtor's good faith and the feasibility of the Plan. Fannie Mae further asserts that the discount-factor to be applied to its secured claim fails to satisfy the "payment over time" provisions of § 1129(b)(2)(A)(II). Finally, Fannie Mae alleges that the proposal to credit previously passed-through net rents against postconfirmation payment requirements violates the fair and equitable requirements of 11 U.S.C. § 1129(b)(1) and (b)(2).

The Court will discuss each of Fannie Mae's objections in turn.

A. *Confirmation Under § 1129(a)*

1. *Classification*

The Court finds that any classification arguments Fannie Mae has advanced are no longer relevant. Fannie Mae, as the primary creditor in this case, holds a claim in the approximate amount of $1,970,314. Repayment of that obligation is secured by a mortgage against the Debtor's real property, an assignment of rents and a security interest in personalty. The Plan, as orally amended, classifies Fannie Mae's claim as fully secured. Fannie Mae, as the sole member of the only class of secured claims, would have no reason to complain about the classification of any other creditor's claim. Because the Plan does not give Fannie Mae an unsecured deficiency claim, there is no classification argument Fannie Mae can assert on its own behalf. Accordingly, any classification argument still being advanced by Fannie Mae is overruled.

2. *Artificial Impairment*

The Plan proposes to delay for six months the repayment of two classes of non-insider unsecured claims. Fannie Mae argues that such treatment is merely an attempt to mini-

mally impair those classes of claims to enable the Plan proponents to obtain the acceptance of at least one impaired class, as required by 11 U.S.C. § 1129(a)(10). One class is composed solely of judgment lien creditors. According to the Debtor the only potential member of that class, holding a claim which is disputed, did not vote. The other class accepted the Plan.

 Credible unrefuted testimony established that the Debtor had business and economic reasons for delaying repayment to those two classes. Those reasons include obligations to pay postpetition real estate taxes, insurance escrows, and current net rents pass-through payments, the legal requirement to satisfy administrative expenses, and the need to provide for deferred maintenance costs and certain necessary operating reserves for the property. Those requirements exceed the Debtor's available cash. See Tr. II: 219–221, testimony of R. Pausch. Although the Court believes that the Debtor's general partner would find a way to provide immediate payment of all unsecured claims if necessary, the Bankruptcy Code does not require that result. If plan proponents have valid, credible reasons for impairing a class of claims, another class cannot argue that it has been deprived of veto power over a plan. Fannie Mae's rejection of the Plan entitles it, as a rejecting class, to demand that the more stringent requirements of § 1129(b) be met as to the treatment of its secured claim. Insistence on more than that is an unwarranted attempt to disturb the balance of rights among a plan proponent, a rejecting class and other creditors. See Connecticut Gen. Life Ins. Co. v. Hotel Assocs. (In re Hotel Assocs.), 165 B.R. 470, 475 (9th Cir. BAP 1994). Accordingly, Fannie Mae's objection on grounds of artificial impairment is overruled.

### 3. Good Faith

 Whether a plan has been proposed in good faith is determined "in light of the totality of circumstances" and in light of the Bankruptcy Code's purpose to provide debtors with a fresh start. B.M. Brite v. Sun Country Dev., Inc. (In re Sun County Dev., Inc.), 764 F.2d 406, 408 (5th Cir.1985).

Fannie Mae presented no evidence to support its claim of lack of good faith or from which the Court could infer that the Plan is not intended by the Debtor as an effort to reorganize. Fannie Mae's arguments regarding specific plan terms are better addressed under particular requirements for confirmation and, specifically, under the "fair and equitable" requirements of 11 U.S.C. § 1129(b). Further, to the extent Fannie Mae argues that class impairment was somehow improper, such argument is not supported by the evidence. Therefore, the Court overrules Fannie Mae's objection that the Plan is not proposed in good faith and finds that the Plan satisfies § 1129(a)(3).

### 4. Feasibility

Much time in the courtroom was spent on testimony in support of and against feasibility of the Plan, as supported by the Debtor's projections of its future income stream and net income available to make the Plan payments.

 As a legal standard, this Court believes that a plan proponent's satisfaction of the feasibility requirement of § 1129(a)(11) does not require proof that meeting the economic projections is certain. In re U.S. Truck Co., 47 B.R. 932, 944 (Bankr.E.D.Mich. 1985), aff'd, 800 F.2d 581 (6th Cir.1986). The requirement is to prevent confirmation of visionary schemes. In re Pizza of Hawaii, Inc., 761 F.2d 1374 (9th Cir.1985), quoting 5 Collier on Bankruptcy, para. 1129.02. The Court must find that the financial projections presented to support a plan of reorganization are derived from realistic and reasonable assumptions which are capable of being met. The fact that unexpected events may defeat those projections does not make a plan unfeasible as a matter of law or fact.

 This Court routinely finds feasibility and confirms chapter 13 plans even though all parties are aware that the debtor wage earner may have a job interruption which would prevent payments to the plan. Unless that interruption is known and is certain at the time of confirmation, that mere possibility does not prevent confirmation. The Court understands that the feasibility evaluation for a chapter 11 plan is somewhat

stricter than for a chapter 13 plan, not because the language of the Bankruptcy Code specifically requires such increased scrutiny, but because confirmation of a chapter 11 plan generally acts as a discharge at the time of confirmation, rather than only after the promised payments have been made. (Compare 11 U.S.C. § 1129(a)(1) and § 1141(d)(1) with 11 U.S.C. § 1325(a)(6) and § 1328(a)). In the chapter 11 context, that concern means the scrutiny of feasibility should increase as the effect of the discharge on creditors increases. Were this plan proposing to pay only a small percentage of creditors' claims, the Court's evaluation of feasibility would be stricter than when all claims are to be paid in full.

■ The Plan of the Debtor and Cardinal proposes full payment of all claims. The effect of the discharge which occurs at confirmation is, therefore, primarily a delay in a creditor's collection efforts until such time as a default under the Plan may occur. Feasibility evaluation *in that context* should consider primarily such factors as: (1) the realism and reasonableness of the Plan's assumptions; (2) the comparison of those assumptions with whatever actual accounts of performance are available; (3) the significance of any demonstrated changes in the Debtor's operations or external factors which may impact performance; and (4) the stability and soundness of the management vested with the responsibility of achieving the forecasted performance.

■ Fannie Mae's feasibility challenge focuses primarily on the Debtor's assumption of a 3% annual growth in gross income, primarily from increased rents, and the optimism of future performance estimates when compared with prepetition historical performances.

■ The Court agrees that forecasts which depend upon great improvement over past performance must be explained. That explanation has been provided in this case. Recent cyclical downturns in the Atlanta area real estate market account for some of the problems in past performances. Likewise, the troubles of the Debtor's general partner and its property management affili-ate, as those entities fell into financial decline and then struggled to operate in a chapter 11 environment, took a toll on the performance of this Debtor's property. More recent performance, however, shows, as a matter of fact, that the Atlanta market has turned around. The successful emergence from bankruptcy of the Debtor's general partner and its apartment management company has enabled the Debtor to demonstrate a capable refocused management which this Court believes can accomplish what it projects. Neither the competence of that management nor the high occupancy expectations are challenged. In fact, projections advanced for 1994 during a hearing in May, 1994 have been exceeded. *See Tr. I: 88–91,* testimony of D. Williams. Projected performance, even with the conservative results shown in Debtor's exhibits A, B & C, support the Plan's feasibility. Although future achievements cannot be certain, the Court finds that the Debtor is likely to achieve the increases in income it needs. The Plan, therefore, is feasible. Accordingly, Fannie Mae's objection to the feasibility of the Plan is overruled.

### 5. *Conclusion Under § 1129(a)*

Based upon the Court's findings on specific elements above, upon the evidence and statements of counsel offered in support of certain uncontested elements of § 1129(a), and upon the Court's review of the Plan, the Court finds that all § 1129(a) elements for confirmation have been met except for the requirement in § 1129(a)(8) that all impaired classes accept the plan. Upon the request of the proponents under § 1129(b)(1), therefore, the Court will consider whether the Plan can be confirmed over Fannie Mae's rejection under the "cram down" requirements of § 1129(b).

### B. *Requirements Under § 1129(b)*

■ The most difficult aspect of this confirmation decision is whether the Plan properly treats Fannie Mae's secured claim as required by 11 U.S.C. § 1129(b)(1) and (2)(A). One impaired unsecured class failed to vote and thereby also must be evaluated under the § 1129(b) standards. Because that class is to be paid 100% with a discount factor to compensate for the six-month delay in payment, the treatment proposed for that

class meets the standard required by § 1129(b)(2)(B)(i).

Fannie Mae objects to the treatment proposed for its claim. It challenges the appropriateness of the discount factor to be applied to the stream of payments to be made on its claim and the fairness and equity of the Plan's proposal to use certain post-petition payments of net rents made to Fannie Mae as credits against payments scheduled for the first sixteen months of the Plan.

The parties have agreed that, as of March 16, 1995, the Debtor's real property has a value of $1,691,000. Fannie Mae also has a security interest in approximately $297,-695.38 of post-petition net rents (exclusive of tax and insurance escrows), paid to it during this case. The Debtor further holds in excess of $32,000 in net rents. Fannie Mae's claim as of the bankruptcy filing date is $1,970,314. That amount reflects principal, accrued interest, late charges, $178,668 in statutory attorneys' fees, and a reduction for certain funds held in suspense. Its claim, therefore, is fully secured by the combined value of the real property and the net rents collateral.

### 1. *The Discount Factor Proposed for Fannie Mae's Secured Claim*

The Plan proposes a discount factor equal to a market rate of interest to be applied to Fannie Mae's secured claim to satisfy the requirement that the deferred cash payments have "a value, as of the effective date of the plan, of at least the value of" Fannie Mae's secured claim. *See* § 1129(b)(2)(A)(i)(II). The feasibility projections offered to support the Plan accommodate a discount factor between 9.6% and 10.15%. If the discount factor is found to be higher than 10.15%, the Plan will not be feasible. The Debtor and Cardinal believe the "market rate" is 9.6% and Fannie Mae believes it is 10.2%. The original contract between the Debtor and Fannie Mae's assignor in 1988 carried an annual interest rate of 10%.

■ Subsection (A)(i)(II) of § 1129(b)(2) contemplates that each holder of a claim in a dissenting class of secured claims, if it is to be paid in deferred cash payments, must receive a total amount equal

in value, as of the effective date of the plan, of at least the value of the secured claim. As the legislative history reflects, this requirement recognizes the concept of the "time-value" of money. H.R. 595, 95th Cong., 413 Sess. 413 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6369. Generally, dollars received today have greater value than the same amount of dollars received in the future. If payment is delayed, compensation for that delay is required. Accordingly, unless a plan provides for payment of the full amount of a secured claim on the effective date, the proposed payment stream must be "discounted" to the present value of the allowed secured claim.

The language of this requirement is similar, but not identical, to that set forth in the chapter 13 confirmation standard. *See* 11 U.S.C. § 1325(a)(5)(B). The Court of Appeals for the Sixth Circuit has held that section to require the Bankruptcy Court "to assess interest on the secured claim for the present value of the collateral (if it is not to be paid immediately) in order not to dilute the value of that claim through delay in payment." *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 429 (6th Cir.1982). An appropriate discount factor assures that the value of the secured claim will not be diluted.

The *Memphis Bank* court determined that an appropriate discount rate for secured claims in a chapter 13 plan would be "the current rate of interest used for similar loans in the region." 692 F.2d at 431. The court assumed that "[b]ankruptcy courts are generally familiar with the current conventional rates on various types of consumer loans." *Memphis Bank*, 692 F.2d at 431. In essence, this interpretation "requires the creditor to make a new loan in the amount of the value of the collateral ... and the creditor is entitled to interest on his loan." *Memphis Bank*, 692 F.2d at 429.

■ Although *Memphis Bank* was a chapter 13 case, the language and purpose of 11 U.S.C. § 1325(a)(5)(B)(ii) is similar to that of § 1129(b)(2)(A)(i)(II). Therefore, under controlling case law in this circuit, the discount rate to be applied to a secured claim paid over time under a chapter 11 plan must

be expressed as the current market rate of interest for similar loans. *See In re Aztec Company,* 99 B.R. 388, 390 (Bankr. M.D.Tenn.1989) and *In re Memphis Partners, L.P.,* 99 B.R. 385, 386 (Bankr. M.D.Tenn.1989).

▆▆▆ Fannie Mae's arguments, which this Court has heard numerous times from other secured lenders, are based upon an erroneous premise. That premise is that Congress, through its bankruptcy powers, cannot enact any remedy which requires a secured creditor to bear any of the impact of a debtor's financial reorganization. In effect such lenders assume and argue that reorganization is acceptable only if they walk away with the property which secures repayment of their loan or, if a coerced "new loan" must be considered, that the debtor's need for financial reorganization and the Bankruptcy Code's definition of a secured claim make the discount factor to be applied to any cram down repayment over time much higher than any borrower in such circumstances could possibly pay. In other words, the debtor must have resources such that a chapter 11 reorganization is not needed or it cannot affect the position of the lender in a chapter 11 case. This Court believes that argument simply reflects the lender's dislike for bankruptcy reorganization. It does not reflect this Court's understanding of either Congress' bankruptcy powers or the law as enacted in the Bankruptcy Code. Further, the lender is not actually extending new monies to the Debtor; rather, it is being delayed in the repayment of a previous loan. Such delay should not entail cost due to inflation or subject the lender to undue risk of nonpayment. That protection is all the discount factor is meant to provide.

▆▆▆ Because the extension of repayment is required as part of the chapter 11 remedy, no sound legal or policy argument can be advanced for increasing the discount factor because the "borrower" is a debtor in a reorganization chapter of the Bankruptcy Code or because the loan-to-value ratio is established by the Bankruptcy Code. If a plan of reorganization is feasible, qualification of the "borrower" is established. Under the facts of this case, therefore, the discount

factor in this circuit must, as a matter of fact, represent a reasonable rate of interest in the market place for a commercial loan secured by a multi-family apartment property. If current rates differentiate between workout or restructured loans and new extensions of credit, that difference should be considered. The time when the proposed rate is measured is the date of the hearing on confirmation. The purpose for the analysis is to protect the repayment from diminution because of inflation and to recognize that some acceptable risk of nonpayment exists.

▆▆▆ Analysis of a proposed discount factor begins with an examination of the current yield of a United States treasury obligation most analogous to the repayment term proposed by a plan of reorganization. In this case, that debt instrument is a ten year treasury note. To reach the fair net yield to the lender, a spread is added for risk of nonpayment and expected decrease in the dollar over time. The resulting range of rates should yield a "market rate of interest" as required in *Whitman,* 692 F.2d at 429. This method has been used previously. *See In re Aztec Co.,* 107 B.R. 585, 588 (Bankr. M.D.Tenn.1989) and *In re Montgomery Court Apts.,* 141 B.R. 324, 342 (Bankr.S.D. Ohio 1992).

▆▆▆ The ten year treasury note yield on March 3, 1995 was 7.31%. Expert testimony and documentary evidence showed the most likely current spread over that rate for a commercial loan less than $5,000,000, repayment of which is secured by a multi-family apartment property, to be 230 to 260 basis points. To that spread will be added 12½% basis points for servicing costs because the Court is assuming that Fannie Mae or another entity will incur costs for monitoring and accounting for the payments.

Based on the foregoing and recognizing that this is a chapter 11 reorganization legal remedy, the Court finds that the Plan must offer a discount factor between 9.735% and 10.035% to be applied to payment over time of Fannie Mae's allowed secured claim. Because the Plan proposes a rate of 9.6% or a market rate as found by the Court and the Plan is feasible up to a rate higher than

9.735%, Fannie Mae's objection to confirmation is sustained as to the 9.6% discount factor only. So long as a rate of at least 9.735% is used to calculate the payments to Fannie Mae, such payments will satisfy the present value calculation required by § 1129(b)(2)(A)(i)(II).

### 2. The Fair and Equitable Standard and the Application of Previously Paid Rents to Payments Under The Plan

The Plan provides that approximately $181,000 of the net rents paid to Fannie Mae during this case will be used as credits for the first sixteen months of payments on Fannie Mae's secured claim. The Plan also provides that the remaining $117,000 of previously passed-through net rents will be used to pay down the "principal" of Fannie Mae's claim. Any additional net rents still being held by the Debtor, in an amount of $32,000 plus additional accumulations, will be paid to Fannie Mae on the effective date to be applied against the "principal" of the restated Fannie Mae claim.

Fannie Mae objects to this treatment and maintains that the net rents were paid as adequate protection, not for any decline in the value of its real property security, but for the Debtor's use of cash collateral. These were adequate protection payments which Fannie Mae believes are not available for additional uses and, pursuant to certain case law, do not reduce its claim.[1] Therefore, Fannie Mae maintains that repayment of its $1,970,314 claim presently is secured only by the $1,691,000 value of the real property. Based on this conclusion, Fannie Mae believes it has an unsecured claim for $279,314 and that the Plan, as presently proposed, does not properly provide for payment of that unsecured claim. Fannie Mae further appears to argue that because the net rents previously were turned over to it, such rents were abandoned by the Debtor on behalf of the estate and are no longer subject to control by the Debtor.[2] Finally, even if the proposed application were permitted, Fannie

Mae posits that such use of credits unfairly and inequitably causes it to become undersecured during the application period; impermissibly shifts the risk of any successful reorganization; and impairs its lien position. The economics of the Plan do not support feasibility if the application feature is not allowed, and Fannie Mae maintains that such application is inappropriate and not permitted.

The Court has read all of the cases cited by Fannie Mae and has considered the "application" feature of the Plan in great detail. Critical to any analysis of Fannie Mae's arguments is a determination of the effect of the agreed cash collateral order previously entered in this case and an analysis of the meaning of a security interest in rents.

Paragraph E of the Cash Collateral Order provides in applicable part that the "Debtor shall pay to Meridian Mortgage and deliver to Fannie Mae ... on a monthly basis, ... after allowing for an operating cushion of $2,000, all Rents in excess of amounts actually expended, pursuant to Paragraph D above, as "adequate protection" (as defined in Section 361 of the Bankruptcy Code) for the use of Fannie Mae's cash collateral.... Fannie Mae shall apply the Rents it receives first, to unpaid accrued interest and costs due under the Note and, second, to the principal balance of the Note; provided, however, that such application shall not be deemed a waiver by Debtor of its right to object to such application." The provisions of the Plan calling for a different application of those payments are, in effect, an objection to Fannie Mae's intended application. Therefore, the cash collateral order did not establish how the pass-through net rent payments must be applied. Nor does the Court believe that calling the payments adequate protection established that adequate protection was required or in what amount. The cash collateral order establishes, however, that neither of the parties believed that the payments were in the na-

**1.** See Ridgemont Apartment Assoc. v. Atlanta English Village, Ltd. (In re Ridgemont Apartment Assoc.), 110 B.R. 77 (N.D.Ga.1989) aff'd, 890 F.2d 1166 (11th Cir.1989).

**2.** See In re Veeco Inv. Co., L.P., 170 B.R. 149 (Bankr.E.D.Mo.1994) and Mutual Life Ins. Co. v. Paradise Springs Assocs. (In re Paradise Springs Assoc.), 165 B.R. 913, 924–926 (Bankr.D.Ariz. 1993).

ture of compensation for any perceived decline in value of the real property. As a matter of fact, the real property has increased in value during the pendency of this case. Therefore, the question that remains is what use of rents was being adequately protected and what decline in value was contemplated.

This Court has already found in another Cardinal partnership case that a mortgagee with a rent assignment has no reasonable expectation of using a property's gross rents to pay the mortgage debt. *See In re Willowood East Apartments, Ltd.,* 114 B.R. 138 (Bankr.S.D.Ohio 1990). The language in paragraph 26 of the Multifamily Deed to Secure Debt, Assignment of Rents and Security Agreement between these parties is similar to the one in *Willowood.*

■ Whether Fannie Mae is characterized as having no protected interest in the portion of the rents reasonably used to operate the property or whether such interest is merely cut off under 11 U.S.C. § 552(b), the result is the same. The only interest in the rents for which Fannie Mae could show decline in value is the net rents. Obviously, if, after Fannie Mae's right to apply those net rents becomes choate under state law, the Debtor uses those net rents for purposes unrelated to maintenance or operation of the real property, Fannie Mae may have the right to demand adequate protection, probably by the grant of a lien on additional property. There is persuasive authority, however, that any adequate protection demanded in connection with an assignment of rents should be considered only in connection with an evaluation of the creditor's entire secured position. *See, In re Mullen,* 172 B.R. 473 (Bankr.D.Mass.1994). That is not what happened here, however.

■ Fannie Mae had its cash collateral returned by the Debtor and, therefore, the Debtor never "used" that collateral within the meaning of 11 U.S.C. § 363. The Debtor gave up its right to earn interest on those sums, undoubtedly because the interest it would have earned would have been less than amounts required to be paid to Fannie Mae pursuant to a confirmed plan. Essentially the Debtor recognized that the net rents were Fannie Mae's collateral and gave that collateral to the creditor sooner rather than later. By retaining a right to challenge the creditor's purported application of the payments, however, neither the Debtor nor the bankruptcy estate abandoned the estate's interest in those funds by virtue of the cash collateral order. And, frankly, there was no diminution in value of Fannie Mae's collateral which was required to be protected. At the time this case was filed, Fannie Mae was undersecured when its debt was compared to the value of its total collateral. Only at the end of 1994 had Fannie Mae's debt become oversecured. This interpretation means that application of the rent pass-through payments can be dealt with by the Plan.

■ There are three components to the security for Fannie Mae's $1,970,314 claim. One component is its mortgage interest in the apartment property. The parties agree that the apartment property should be valued at $1,691,000 as of March 16, 1995. There is additional security in postpetition net rents in the net amount of $297,695.38, previously passed on to Fannie Mae during the case, and in net rents in excess of $32,000 accumulated by the Debtor since the last pass-through payment. Fannie Mae also has a security interest in certain personal property and intangible rights which has not been valued and which the Court, therefore, assumes is not of very significant value. When those items of security are added together, the collateral values exceed Fannie Mae's debt. Fannie Mae, therefore, is oversecured. That oversecurity began at the end of 1994. Only since that date has Fannie Mae been entitled to accrue postpetition interest on its secured claim pursuant to 11 U.S.C. § 506(b).

■ This determination means that Fannie Mae no longer has any unsecured claim in this case which must be provided for by the Plan.[3] Therefore, the "credits" proposed by the Plan as application for prior rent pass-through payments need be evaluated only under the fair and equitable standard for allowed secured claims. *See* § 1129(b).

■ Fannie Mae argues that use of the previously passed-through cash collateral as

---

3. For an alternative explanation of the elimination of the unsecured claim, *see In re 354 East* 66th Street Realty Corp., 177 B.R. 776 (Bankr. S.D.N.Y.1995).

payments under the Plan effectively and significantly diminishes the value of its overall collateral post-confirmation. Because of the thirty-year amortization of Fannie Mae's secured claim, most payments by credits in the first sixteen months will be applied to interest on the restated debt and not to principal. Fannie Mae thus concludes that little of its restated principal claim will have been reduced, but the value of its collateral will have declined significantly.

The Court agrees with Fannie Mae that such allegations, if true, could raise questions about the treatment of Fannie Mae's secured claim under the cram down provisions of § 1129(b). Fannie Mae's analysis is flawed, however, because it overlooks the continuation of its security interest in the rents after confirmation. Even though right to possession of those rents would not vest until a default occurs, Fannie Mae retains a security interest in those rents. Further, the Plan proposes an immediate reduction of "principal" by the application of at least $117,000 of the postpetition net rents payments. Additionally, Fannie Mae looks only at the value of its cash collateral and not at the projected value of the real property. The application of $117,000 plus payments in excess of $32,-000 is to occur on the effective date. Although the Plan states that those amounts go to reduce the "principal" of Fannie Mae's debt, that designation is more properly to reduce the restated debt (the secured claim), even though such claim may and does include more than prepetition principal. In essence the entire prepetition claim, including late charges, interest to the filing date, statutory attorney fees and post-petition interest only after January 1, 1995, becomes the restated "principal" of the allowed secured claim to be paid over time. The Court presumes that is what the Plan intends.

The "credits" payments then need to be examined for their effect on Fannie Mae's collateral position, taken as a whole. When that analysis is performed, it can be seen that Fannie Mae's position is not subject to erosion. Its secured claim is paid down on the effective date of the Plan in excess of $150,000; it has a continuing lien on rents which renews monthly (even though not subject to possession absent default), the Debtor is accumulating cash including an operating reserve, all of which is subject to Fannie Mae's lien; and the value of the real property is increasing over the term of the Plan. Although the value of the real property does not increase as much during the period of the "credits" as it does later in the Plan term, the risk of default during the "credits" period is very small indeed. Taken as a whole, the Court believes the treatment proposed for Fannie Mae's allowed secured claim is fair and equitable and does not subject Fannie Mae to an unacceptable risk of either payment default or erosion of collateral value.

*Conclusion*

Based upon the foregoing, the Court finds that the First Amended Chapter 11 Plan proposed by the Debtor and Cardinal, subject to findings herein, may be confirmed under the tests set forth in 11 U.S.C. § 1129(a) and (b), despite the rejection by Fannie Mae. Accordingly, Fannie Mae's objections are **OVERRULED**. As a result of that ruling, Fannie Mae's request for relief from stay if the Plan is not confirmed is also **DENIED**. The Debtor shall submit an order of confirmation forthwith.

**IT IS SO ORDERED.**