RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18b0006p-06

# BANKRUPTCY APPELLATE PANEL

OF THE SIXTH CIRCUIT

_____

In re: JOHN JOSEPH LOUIS JOHNSON, III,

*Debtor.*

No. 16-8045

_____

Appeal from the United States Bankruptcy Court
for the Southern District of Ohio at Columbus.
No. 14-57104—John E. Hoffman, Jr., Judge.

Argued: November 14, 2017

Decided and Filed: April 16, 2018

Before: HARRISON, OPPERMAN, and WISE, Bankruptcy Appellate Panel Judges.

_____

## COUNSEL

_____

**ARGUED:** Jeffrey M. Levinson, LEVINSON LLP, Cleveland, Ohio, for Appellant. Rocco I. Debitetto, HAHN LOESER & PARKS, LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Jeffrey M. Levinson, LEVINSON LLP, Cleveland, Ohio, for Appellant. Rocco I. Debitetto, Marc J. Kessler, Daniel A. DeMarco, Jeffrey A. Yeager, HAHN LOESER & PARKS, LLP, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

MARIAN F. HARRISON, Bankruptcy Appellate Panel Judge. RFF Family Limited Partnership, LP ("RFF") appeals from the bankruptcy court's Order Confirming the Third Amended Plan of Reorganization ("Confirmed Plan") of John Joseph Louis Johnson, III ("debtor"). The debtor argues that this appeal is constitutionally and equitably moot. Although the bankruptcy court properly confirmed the debtor's Confirmed Plan, the Panel agrees with the

debtor that this appeal is equitably moot.  For the reasons set forth below, the Panel dismisses the appeal of RFF as equitably moot.

### ISSUES ON APPEAL

1. Whether this appeal should be dismissed on the grounds of constitutional mootness.
2. Whether this appeal should be dismissed on the grounds of equitable mootness.
3. Whether the bankruptcy court erred by concluding that the debtor's Confirmed Plan satisfied the requirements of 11 U.S.C. § 1129(a)(11).[1]

### JURISDICTION

The United States District Court for the Southern District of Ohio has authorized appeals to the Panel, and no party has timely elected to have this appeal heard by the district court. 28 U.S.C. § 158(b)(6), (c)(1).  A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1).  For purposes of appeal, a final order "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989) (citations and internal quotations omitted).  An order overruling objections to and confirming a plan of reorganization is a final order. *Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs., L.L.C.* (*In re Brice Rd. Devs., L.L.C.*), 392 B.R. 274, 278 (B.A.P. 6th Cir. 2008).

### FACTS

On October 7, 2014, the debtor filed his voluntary petition for relief under Chapter 11. On the petition date, the debtor was and continues to be a professional hockey player with the

---

[1] RFF also raised as an issue on appeal whether the bankruptcy court erred by concluding that the Confirmed Plan satisfied the requirements of 11 U.S.C. § 1129(a)(7).  RFF objected to confirmation based on 11 U.S.C. § 1129(a)(7)(A)(ii), which mandates that non-accepting creditors be paid at least as much as they would receive in a liquidation as of the effective date.  RFF argued that the Confirmed Plan does not adequately provide for or protect RFF's claim to the extent it is ultimately allowed as a secured claim.  As RFF conceded at oral argument, this issue is moot.  The Panel affirmed the bankruptcy court's determination that RFF does not have a secured claim in the Player Contract or the income thereto. *RFF Family Partnership, LP v. Johnson* (*In re Johnson*), No. 16-8035, 2017 Bankr. LEXIS 1480 (B.A.P. 6th Cir. June 2, 2017).  RFF did not appeal this decision, and therefore there is no need to consider whether the Confirmed Plan should have provided for RFF's potential secured claim.

Columbus Blue Jackets ("Blue Jackets") of the National Hockey League ("NHL"). Pursuant to the debtor's contract ("Player Contract") with the Blue Jackets, his gross income has been $5 million per year since the petition date. The Player Contract's term ends at the conclusion of the 2017–18 NHL season. In anticipation of the income he would be making under the Player Contract, the debtor accumulated a total indebtedness of $21,343,723.64 in pre-petition debt. The debtor's eight largest creditors (Capital Financial Holdings, LLC, Capital Holdings Enterprises, LLC, U.S. Congressman Rodney Blum, and CapStar Bank (collectively, the "Initial Settling Lenders"); Pro Player Funding, LLC ("Pro Player") and Cobalt Sports Capital, LLC ("Cobalt") (Cobalt with Pro Player and the Initial Settling Lenders, collectively, the "Settling Lenders"); EOT Advisors, LLC ("EOT"); and RFF) asserted claims in the aggregate amount of approximately $14 million.

On March 5, 2015, the debtor filed a motion seeking to convert his case to chapter 7. The majority of the debtor's eight largest creditors filed objections. The bankruptcy court conducted a two-day evidentiary hearing in early September 2015 and entered an order denying the motion to convert on February 26, 2016. The bankruptcy court denied the motion based on the debtor's bad faith conduct and his failure to abide by his fiduciary duties. The bankruptcy court found that the debtor failed to engage in good-faith negotiations with his creditors and warned that "the parties should undertake good-faith efforts to resolve their differences so that a consensual plan of reorganization for the Debtor may be confirmed. Failing that, what lies ahead does not look promising—for the Debtor a future clouded by uncertainty, for the Objecting Creditors further delay, and for all parties additional costly litigation." *In re Johnson*, 546 B.R. 83, 172 (Bankr. S.D. Ohio 2016). In conjunction with the denial of the motion to convert, the bankruptcy court issued an order to show cause why a chapter 11 trustee should not be appointed based on the findings of fact set forth in the opinion and order denying the motion to convert.

Thereafter, the debtor and the Initial Settling Lenders worked collaboratively over the following six months to reach a settlement embodied in the Confirmed Plan (Class 5A) filed on August 29, 2016. The settlement entails allowing the Initial Settling Lenders' claims in their full face amount and providing for a capped, 35% aggregate recovery during the remaining term of the Player Contract; provided, however, that if the debtor's aggregate gross earnings exceed

$4.5 million during the three years after the termination of the Player Contract, the Initial Settling Lenders will also receive 10% of the debtor's future earnings (net of taxes, withholdings, and agreed living expenses) during that period. Under the Confirmed Plan, these amounts are placed into the Class 5A Escrow. The settlement also encompasses a "sub-settlement" among the Initial Settling Lenders, whose claims are subject to varying degrees of merit, as to how Class 5A Escrow amounts are allocated among them.

The debtor made the same settlement offer to Pro Player, Cobalt, EOT, and RFF (the "Class 5B Creditors"). After further negotiations, Pro Player and Cobalt settled with the debtor by "effectively capping their recovery at approximately 58% of the full face amount of their claims." Under the Confirmed Plan, the Class 5B Creditors participate in distributions from a Creditor Trust. The Class 5B Creditors stand to benefit from any recoveries the appointed Creditor Trustee might obtain from pending adversaries against the debtor's parents and former financial advisors. As a result of the negotiations, six creditors holding more than $12 million of debt supported the Confirmed Plan, and only EOT and RFF still rejected the Confirmed Plan.[2] In approving these settlements as fair and equitable, the bankruptcy court found:

> The value of each settlement derives from the fact that the Debtor's estate will avoid incurring an enormous amount of attorneys' fees and expenses that instead will be used to pay creditors' claims. In fact, as the settlement motion with Pro Player shows, the Debtor is estimating that the costs and expenses of litigating with just one creditor would be approximately $250,000. Thus, the settlements with the four Initial Settling Lenders potentially is saving the estate $1 million. As a result of the settlements with Pro Player and Cobalt, the Debtor is contributing an additional half a million dollars to creditors that he otherwise was anticipating would be used to litigate with those two creditors. The amount is in line with the fees and expenses that the Court could see being incurred in this litigation.

*In re Johnson*, Ch. 11 Case No. 14-57104, 2016 WL 8853601, at *7, 2016 Bankr. LEXIS 4598, at *19–20 (Bankr. S.D. Ohio Nov. 10, 2016).

---

[2]On August 17, 2017, the bankruptcy court approved the debtor's settlement agreement with EOT whereby EOT's claim is allowed as a Class 5B Claim in the amount of $110,000 with a cap on distribution in the amount of $38,500 under the Confirmed Plan.

Under the Confirmed Plan, the debtor was required to use his non-exempt assets (post-petition earnings) existing as of the effective date of the Plan (which occurred on December 8, 2016 (the "Effective Date")) to pay secured creditors the value of their collateral, in kind or in cash payments. On the Effective Date, the remainder of these accumulated post-petition earnings went into the Class 5A Escrow, for the benefit of the Initial Settling Lenders, and into the Creditor Trust for the benefit of Class 5B creditors, including RFF. Allowed General Unsecured Claims are being paid a 35% dividend, bringing them on par with the Settling Lenders, and Allowed Convenience Claims (i.e., claims in the amount of $1,000 or less) are being paid the lesser of their claim amount or $500 (providing a dividend of between 50–100%).

The Confirmed Plan is further funded by the debtor's continued earnings (minus living expenses and a small amount necessary to pay administrative expenses) to make pro rata payments to the Class 5A Escrow and the Creditor Trust. Specifically, "Class 5A and Class 5B are paid pro rata until the Class 5A creditors receive the Fixed Payment, at which time creditors in Class 5B (but not Class 5A) will continue to receive payments, with Cobalt and Pro Player receiving payments until they reach the cap on their recoveries and RFF—to the extent it has an allowed claim—continuing to receive payments until it receives a full recovery on its allowed claim." *In re Johnson*, 2016 WL 8853601, at *10, 2016 Bankr. LEXIS 4598, at *30-31. In addition, the Creditor Trust is to be augmented by any recoveries made by the Creditor Trustee. Presently, RFF does not have an allowed claim due to a pending adversary in which RFF asserts that its claim is nondischargeable pursuant to 11 U.S.C. § 523, and the debtor seeks, among other relief, the disallowance of RFF's entire claim.

When the debtor's current Player Contract expires or is terminated, the debtor must contribute his net earnings (minus living expenses) from any source up to the fifth anniversary of the entry of the confirmation order. This includes any future player contract through the 2020–21 NHL season. All post-confirmation income became property of the estate, and therefore subject to the automatic stay for the duration of the Confirmed Plan:

> All assets, interests, and other property of the estate that are not Creditor Trust Assets, Distributable Cash, or otherwise required to be deposited or disbursed by Debtor into the Class 5A Escrow or Creditor Trust shall remain property of the estate subject to the terms and conditions of this Plan and shall not vest in Debtor

until the case is dismissed, converted, or a discharge is issued, whichever occurs first.

[Third Amended Plan, Bankr. No. 14-57104, ECF No. 657, § 8.05, at 21].

The bankruptcy court overruled RFF's numerous objections and confirmed the debtor's Third Amended Plan of Reorganization on November 23, 2016. The Effective Date occurred on December 8, 2016.

## DISCUSSION

The issues presented are whether RFF's appeal is constitutionally and/or equitably moot; and whether the bankruptcy court erred in confirming the debtor's plan over RFF's objections.

### I. The Equitable or Constitutional Mootness of RFF's Appeal

### A. Constitutional Mootness

The doctrine of constitutional mootness is derived from Article III of the United States Constitution, which provides that the exercise of judicial power only extends to actual cases and controversies. *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 70 (1983). To dismiss a case due to constitutional mootness, events must have occurred during the pendency of the appeal that make it impossible to grant any effectual relief. *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (citation omitted). In other words, if no effective relief is possible, the appeal must be dismissed for lack of jurisdiction. *Id*. This does not mean that the available remedy must be fully satisfactory to meet the Article III requirements. *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (citation omitted). Instead, the availability of a partial remedy suffices to prevent a case from being deemed constitutionally moot. *Id*.

The debtor does not point to any events during the pendency of this appeal that would make effectual relief impossible. Instead, the debtor points to the detrimental impact such relief would have on the debtor and on the intricate weave of settlements that led to the Confirmed Plan. This does not constitute constitutional mootness.

**B. Equitable Mootness**

The debtor's argument regarding equitable mootness has merit. The doctrine of equitable mootness is applied to appeals from confirmed plans "to protect parties relying upon the successful confirmation of a bankruptcy plan from a drastic change after appeal." *Curreys of Nebraska, Inc. v. United Producers, Inc.* (*In re United Producers, Inc.*), 526 F.3d 942, 947 (6th Cir. 2008) (citation omitted). "Unlike mootness in the constitutional sense, equitable mootness does not follow from Article III standing principles but is an equitable doctrine applied to protect parties' settled expectations and the ability of a debtor to emerge from bankruptcy." *Id.* (citations omitted); *see also Ochadleus v. City of Detroit* (*In re City of Detroit*), 838 F.3d 792, 798 (6th Cir. 2016) (citation omitted) ("[U]nlike conventional mootness, equitable mootness is not concerned with the court's ability or inability to grant relief; it is concerned with protecting the good faith reliance interests created by implementation of the bankruptcy plan from being undone afterwards.").

In *Bank of Montreal v. Official Comm. of Unsecured Creditors* (*In re Am. HomePatient, Inc.*), 420 F.3d 559, 563–64 (6th Cir. 2005), the Sixth Circuit Court of Appeals adopted the Fifth Circuit's three-factor test for determining whether an appeal from the confirmation of a bankruptcy plan of reorganization should be dismissed as equitably moot: "(1) whether a stay has been obtained; (2) whether the plan has been 'substantially consummated'; and (3) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1225 (6th Cir. 1995) (citing *Manges v. Seattle-First Nat'l Bank* (*In re Manges*), 29 F.3d 1034, 1039 (5th Cir. 1994)).

Regarding the first factor, "[w]hen an appellant does not obtain a stay of the implementation of a confirmation plan, the debtor will normally implement the plan and reliance interests will be created." *In re United Producers, Inc.*, 526 F.3d 942, 948. Accordingly, the failure to obtain a stay counts against the appellant, but "is not necessarily fatal to the appellant's ability to proceed." *City of Covington*, 71 F.3d at 1225–26; *see also In re City of Detroit*, 838 F.3d at 798–99.

In this case, RFF did not seek or obtain a stay. RFF asserts that no stay was sought because the structure of the Confirmed Plan funds distributions to creditors from the debtor's substantial future income, therefore rendering an immediate stay unnecessary. Regardless of RFF's reasons for not seeking a stay, the Confirmed Plan has been implemented, the Effective Date occurred on December 8, 2016, and reliance interests have been created. This factor weighs against RFF.

The second factor considered is whether the confirmed plan has been substantially consummated. "If a plan has been substantially consummated there is a greater likelihood that overturning the confirmation plan will have adverse effects on the success of the plan and on third parties." *In re United Producers, Inc.*, 526 F.3d 942, 948. The Bankruptcy Code defines substantial consummation as:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). This standard has been adopted in the equitable mootness analysis to determine the extent to which the plan has progressed. *In re Manges*, 29 F.3d 1034, 1040–41.

Each element is met here. Property transferred, as outlined above, on the Effective Date. The Class 5A Escrow and the Creditor Trust have been established. A Creditor Trustee has been appointed, assumed control over the Creditor Trust, and has been substituted as the plaintiff in three adversary proceedings against the debtor's parents and various financial advisors. And, distributions under the Confirmed Plan have commenced. Although RFF points out that the Confirmed Plan relies on distributions from the debtor's future income, and the bulk of that income has yet to be earned, this is hardly unusual in the case of a plan of reorganization. That final funding will not occur until future income is received does not alter the fact that all property proposed by the plan to be transferred from debtor's bankruptcy estate as of the Effective Date was transferred to the Class 5A Escrow and Creditor Trust. This factor also weighs against RFF.

The third factor, "whether the relief requested would affect either the rights of parties not before the court or the success of the plan," is the most important. *In re Am. HomePatient, Inc.*, 420 F.3d at 564 (citation omitted). In analyzing this factor, the Sixth Circuit instructs that courts must consider "the nature of the relief requested and whether it amounts to a piecemeal revision of the plan or a wholesale rewriting of it." *In re United Producers, Inc.*, 526 F.3d at 949 (citing *In re Manges*, 29 F.3d at 1043) ("We must evaluate [actions taken pursuant to the Plan], many of which appear irreversible, against the backdrop of the relief sought-nothing less than a wholesale annihilation of the Plan."). For example, the Sixth Circuit held that equitable mootness did not apply where the creditor contested the interpretation of only one provision of a reorganization plan because the creditor's interpretation "would not substantially upset the plan of reorganization itself. The refinancing would go through and no other term of the reorganization would be affected." *Guardian Sav. & Loan Ass'n v. Arbors of Houston Assocs.* (*In re Arbors of Houston Assocs.*), 172 F.3d 47 (6th Cir. 1999) (unpublished table decision). In a different matter, the Sixth Circuit declined to declare an appeal equitably moot because the undisputed evidence showed that the requested relief would not require abandonment of the entire plan. *In re Am. HomePatient, Inc.*, 420 F.3d at 565. Specifically, the Court determined that implementation of the suggested changes to the confirmed plan would not require any of the actions undertaken pursuant to the plan to be reversed. *Id.* at 564–65; *see also In re United Producers, Inc.*, 526 F.3d at 950 (An appellate court "must determine what the consequences of reversal of the confirmed plan would be for the success of the reorganization and for interests of third parties who have relied upon the confirmed plan.").

RFF argues that reversal will not impact non-party creditors or significantly and irrevocably disrupt the implementation of the Confirmed Plan. Specifically, RFF characterizes the debtor's Confirmed Plan as a "pot plan," where the debtor is contributing a fixed amount from his future income over the life of the plan, and distribution is on a pro rata basis with no creditor being assured a sum certain. Moreover, RFF argues that the settlements with other creditors will remain intact because the settlements only involved setting caps to distributions. Further, these creditors were fully aware of the litigation with RFF when they settled their claims, therefore, any reliance interest on a recovery under the Confirmed Plan that is a

derogation of RFF's rights was deliberately chosen in the face of RFF's challenges and should not be protected.

RFF's arguments are unsupported. Its sole remaining issue on appeal is that the bankruptcy court purportedly erred in confirming the Confirmed Plan because it did not meet the requirements of feasibility under 11 U.S.C. § 1129(a)(11). Relief to RFF on this objection could not be narrowly tailored to preserve the feasibility of the Confirmed Plan or permit confirmation of a minimally revised plan. The Confirmed Plan is not merely a "pot plan" as RFF contends. Reversing confirmation based on RFF's argument would result in a wholesale rewriting of the Confirmed Plan, which resulted from comprehensive negotiated settlements whereby multiple creditors with large claims agreed to limit their entitlement to plan proceeds. Stated differently, without the debtor's future income, the Confirmed Plan cannot be successful and the interests of third parties who diligently negotiated settlements will dissipate.

The Panel finds that each of the three factors outlined in *In re American HomePatient, Inc.,* are met in connection with RFF's appeal of the bankruptcy court's confirmation order. Accordingly, the Panel finds that RFF's appeal should be dismissed as equitably moot.

## II. RFF's Objection to Confirmation

Even if RFF's appeal is not deemed moot, the bankruptcy court did not err in confirming the Confirmed Plan over RFF's objection.

The sole remaining issue raised on appeal is RFF's assertion that the bankruptcy court's ruling that RFF may not seek to enforce its nondischargeable claim against the debtor during the term of the Confirmed Plan is contrary to law and premature because the nondischargeability of RFF's claim remains at issue. RFF argues that without a provision addressing the possibility that RFF's claim is nondischargeable, the Confirmed Plan is not feasible, as required by 11 U.S.C. § 1129(a)(11), because the debtor is likely to require further financial reorganization as a result of having committed to pay the greater portion of his income to his other creditors. The bankruptcy court specifically addressed the legal ramifications of RFF's claim if declared nondischargeable:

The reason RFF's position must fail is that, even if it becomes an unsecured creditor with an allowed nondischargeable claim, RFF would have a right only to pro rata payments with other unsecured creditors.

Pro rata payments are precisely what the Plan provides for RFF to receive if it obtains an allowed claim. A nondischargeable claim would not provide RFF any right to earnings that the Plan provides to other unsecured creditors on a pro rata basis. RFF essentially is trying to turn its purported nondischargeable claim into a priority claim that would be entitled to payment before other unsecured creditors. RFF's attempt to do so must fail.

*In re Johnson*, 2016 WL 8853601, at *13, 2016 Bankr. LEXIS 4598, at *39–41 (internal citations omitted). RFF asserts that this legal conclusion is false because the holder of a nondischargeable claim in a chapter 11 case is not bound by the terms of a confirmed plan. Whether the bankruptcy court correctly applied the law is reviewed *de novo*. *Mapother & Mapother, P.S.C. v. Cooper* (*In re Downs*), 103 F.3d 472, 477 (6th Cir. 1996).

RFF asserts that the bankruptcy court erred by relying on non-chapter 11 case law in determining that RFF was only entitled to pro rata payments during the life of the Confirmed Plan.[3] The bankruptcy court cited the following cases for this proposition:

*Copeland v. Fink* (*In re Copeland*), 742 F.3d 811, 814 (8th Cir. 2014) ("[N]ondischargeability [does] not 'dictate full payment of . . . debts during the life of the plan.' Rather, '[t]he debtor need only formulate a plan which pays [the nondischargeable debts] pro rata with other unsecured creditors during the life of the plan and as a continuing obligation thereafter'. . . . [I]t is hardly remarkable that a nondischargeable debt may remain after a debtor has emerged from bankruptcy; that is precisely what 'nondischargeable' means."); *Bentley v. Boyajian* (*In re Bentley*), 266 B.R. 229, 241–42 (B.A.P. 1st Cir. 2001) ("[S]haring on a *pro rata* basis is fair as between those creditors whose debts are dischargeable and those whose are not, because . . . their claims are of equal priority. In fact, even with *pro rata* sharing, the nondischargeable claims still are treated better than the dischargeables because, by virtue of nondischargeability, they retain the right to collect their debts after bankruptcy[.]"); *Reed v. Zwick*

---

[3]RFF attempts to distinguish chapter 13 cases by asserting that there is no feasibility requirement in chapter 13. Feasibility is required of chapter 13 plans pursuant to 11 U.S.C. § 1325(a)(6). However, the feasibility requirement of 11 U.S.C. § 1129(a)(11) is more stringent "because confirmation of a chapter 11 plan generally acts as a discharge at the time of confirmation, rather than only after the promised payments have been made." *In re Ridgewood Apts. of DeKalb Cty., Ltd.*, 183 B.R. 784, 790 (Bankr. S.D. Ohio 1995). "In the chapter 11 context, that concern means the scrutiny of feasibility should increase as the effect of the discharge on creditors increases." *Id.* In the present case, the Confirmed Plan provides that the debtor will not be discharged until the Confirmed Plan has been completed. RFF's attempt to distinguish chapter 13 cases on this basis is without merit.

(*In re Reed*), 2016 WL 5763863, at *4 (Bankr. N.D. Ohio Sept. 30, 2016) ("A creditor holding an allowed claim for a dischargeable general unsecured debt and a creditor holding an allowed claim for a nondischargeable general unsecured debt are both entitled to the same *pro rata* share of any estate assets available for distribution to general unsecured creditors, so the dischargeability determination does not affect the assets to be distributed.").

*In re Johnson*, 2016 WL 8853601, at *13, 2016 Bankr. LEXIS 4598, at *40.

The cases above are illustrative of the distribution scheme contemplated in bankruptcy and are consistent with chapter 11 confirmation law. In *In re Copeland*, the Eighth Circuit struck down a chapter 13 plan in which the debtors proposed "to pay off as much nondischargeable debt as possible, leaving other creditors with nothing at the close of bankruptcy." 742 F.3d at 815. In so doing, the debtors were "prioritizing payment to creditors who will be paid in full *regardless* of the plan implemented in bankruptcy, at the expense of creditors with no other recourse. In short, they propose[d] to 'protect' those creditors least in need of protection, at the expense of the most vulnerable." *Id.* Similarly, in *In re Bentley*, the debtor's chapter 13 plan proposed to pay all nondischargeable student loans in full, with all other general unsecured creditors to receive a 3.6% dividend. The court noted that student lenders' claims were not entitled to any statutory priority ahead of other similarly-situated creditors. 266 B.R. at 240–41. The court further observed that, if anything, the nature of nondischargeable debt "would be cause to discriminate in favor of the dischargeable claims, to even the playing field." *Id.* at 242 n.24. Further, creditors holding nondischargeable debt are better off notwithstanding pro rata sharing because, upon completion of the plan, "the debtor is better able to service [nondischargeable debt] because he or she is free of all dischargeable debt." *Id.* at n.25. Finally, in *In re Reed*, the bankruptcy court held in a chapter 7 case that:

> [a] creditor holding an allowed claim for a dischargeable general unsecured debt and a creditor holding an allowed claim for a nondischargeable general unsecured debt are both entitled to the same pro rata share of any estate assets available for distribution to general unsecured creditors, so the dischargeability determination does not affect the assets to be distributed.

559 B.R. at 199. These cases are consistent with RFF's assertion that nondischargeable claims remain fully enforceable irrespective of plan confirmation.

Pursuant to 11 U.S.C. § 1141(d)(2), "discharge under this chapter does not discharge a debtor who is an individual from any debt excepted from discharge under section 523." In *In re Howell*, 84 B.R. 834, 836 (Bankr. M.D. Fla. 1988), cited by RFF, the court held that a creditor with a nondischargeable claim is entitled to participate "in any distribution made under a plan to similarly situated creditors." In other words, "unsecured creditors holding nondischargeable debts are to be classified and treated the same as other unsecured creditors." *Id.* The difference is that unsecured creditors holding nondischargeable claims are entitled "to collect the balance of the debt outside the plan." *Id*. at 837. In *Newman v. United States* (*In re Newman*), 399 B.R. 541, 548 (Bankr. M.D. Fla. 2008), also cited by RFF, the court held that a creditor holding a nondischargeable claim is not prevented from pursuing post-confirmation collection efforts outside of bankruptcy, regardless of whether such claim was provided for in the confirmed plan. However, RFF offers no support for the proposition that an unsecured creditor holding a nondischargeable claim has the right to collect outside of the plan from property that remains property of the estate.

In a chapter 11 case, "confirmation of a plan vests all of the property of the estate in the debtor" unless "the plan or the order confirming the plan" provides otherwise. 11 U.S.C. § 1141(b). The Confirmed Plan clearly provides otherwise:

> All assets, interests, and other property of the estate that are not Creditor Trust Assets, Distributable Cash, or otherwise required to be deposited or disbursed by Debtor into the Class 5A Escrow or Creditor Trust shall remain property of the estate subject to the terms and conditions of this Plan and shall not vest in Debtor until the case is dismissed, converted, or a discharge is issued, whichever occurs first.

[Third Amended Plan, Bankr. No. 14-57104, ECF No. 657, § 8.05, at 21]. The bankruptcy court affirmed that the "Plan provides that the funds used for living expenses and the holdbacks will continue to be property of the Debtor's bankruptcy estate post-confirmation." *In re Johnson*, 2016 WL 8853601, at *13, 2016 Bankr. LEXIS 4598, at *42.

Despite RFF's protests, nothing prevents a plan from providing that property remains with the bankruptcy estate during the life of the plan rather than vesting with the debtor upon confirmation. "When that occurs, assets remain 'property of the estate' subject to the jurisdiction

of the bankruptcy court and the dictates of the Bankruptcy Code." *Carter v. Peoples Bank & Trust Co.* (*In re BNW, Inc.*), 201 B.R. 838, 849 (Bankr. S.D. Ala. 1996) (citations omitted). *See also Hillis Motors, Inc. v. Hawaii Auto. Dealers' Assoc.*, 997 F.2d 581, 590 (9th Cir. 1993) ("[W]e conclude that after confirmation Hillis' corporate property remained part of the estate to which the automatic stay continued to apply. . . . Because Hillis' corporate property was still property of the estate, it remained under the protection of the automatic stay. The effectiveness of the bankruptcy court's continued supervision of Hillis and its administration of the estate for the benefit of the creditors depended on the court's being able to prevent any efforts to exercise control over the property of the estate."); *Rael v. Wells Fargo Bank, N.A.* (*In re Rael*), Nos. WY-14-035, 08-20251, WY-14-048, 2015 WL 847432, at *5 n.25 (B.A.P. 10th Cir. Feb. 27, 2015) ("[Section] 1141(b) specifically allows debtors to control whether or not estate property vests with them upon confirmation by allowing them to 'provide otherwise.'").

In the present case, the bankruptcy court found that keeping future income as part of the estate was necessary to the success of the plan:

> Keeping the automatic stay in place is necessary because the funds protected by the stay—including the Debtor's living expenses—are necessary to the success of the Plan. Are the Debtor's living expenses higher than the typical individual debtor? Absolutely. And the Court grappled with the issue of whether the Debtor's budgeted expenses are reasonable. But the proffer of the Debtor's testimony supports a finding by a preponderance of the evidence that the living expenses are necessary for him to generate the income that will be used to repay creditors. Now, the Court initially was concerned about what appeared to be his excessive expenditures on items such as food and training. But the proffer of the Debtor's testimony established that, in addition to incurring the expenses any other debtor with a family of three would have, the Debtor has certain other expenses that relate to his status as a professional hockey player. In order to perform well under the current Player Contract and to best position himself for obtaining a future contract, the Debtor incurs personal training expenses both during the hockey season and during the off-season, and he expends more on high-quality foods and nutritional supplements than someone who is not a professional athlete would need to spend. In addition, the Debtor has expenditures related to clothing, entertainment, charity and other professional obligations that are in line with the expectations imposed on an NHL player. No party in interest chose to cross-examine the Debtor in response to the proffer of his testimony.

Moreover, the Settling Lenders all supported the Debtor's budget. Counsel for one of the Initial Settling Lenders (speaking on behalf of all of them) stated:

> We need to make sure that Mr. Johnson continues to work and work at the level that he is working, not only for the next two years, but for years three, four and five . . . . [The budget] is by no stretch of the imagination unreasonable in light of [his] $5 million contract, in light of what the NHL minimum is, in light of the fact that he has to go to work every day and put his best into this. . . . Keeping it in that perspective, it seems to us that this was . . . more than reasonable. . . . In fact, frankly, I think it's too low. [If] he came in and said, I need to at least make [after paying creditors] what the minimum NHL player makes, that would be, I think, a reasonable argument on his part. He's not done that. He's coming in at much less than that. . . . We just think at a high level in the circumstances [the budget] is more than reasonable and we would support it.

Tr. at 56–58.

And as counsel for Cobalt put it: "This isn't in the view of Cobalt household income for living expenses. This is an investment in a professional sports player. . . . And if we don't invest in that business in a way that not just physically but also mentally gives him a reason to play at his best, we're idiots as creditors who expect essentially a return. . . . [T]hat's how this needs to be viewed." Tr. at 59. And counsel for Pro Player similarly stated: "[L]ooking at it as an investment in his future and the agreements that we've made for the percentage of payments on our claims, we are willing to support the budget which in other circumstances may be unreasonable. But here we do think it's reasonable." Tr. at 60. So the Court finds that it is necessary for the success of the Plan to authorize the Debtor to use the amount he has requested for living expenses and to have all of his earnings remain property of the estate (until they are distributed to creditors) for the life of the Plan.

Based on all the foregoing, I find that the Plan is feasible despite RFF's suggestion that it might conceivably take actions to undermine the Plan in the future.

*In re Johnson*, 2016 WL 8853601, at *14, 2016 Bankr. LEXIS 4596, at *42–46.

The bankruptcy court's approval of the Confirmed Plan's provision whereby all future earnings remain property of the estate during the term of the plan complies with 11 U.S.C. § 1141(b) and, therefore, RFF's argument regarding feasibility fails. Even if RFF's claim is

eventually held to be nondischargeable, RFF will still be bound by the terms of the Confirmed Plan. This means that during the term of the Confirmed Plan, the automatic stay prevents RFF from any attempt to undermine the Confirmed Plan by collecting from property of the estate. After the term concludes, RFF may attempt to collect the remaining balance of its claim if it is determined to be nondischargeable.

## CONCLUSION

While the bankruptcy court properly confirmed the debtor's Confirmed Plan, RFF's appeal is DISMISSED as equitably moot.